CHENEY, COMMISSIONER *v.* GEORGIA-PACIFIC PAPER CORP.

5-3090—3091                                         371 S. W. 2d 843

Opinion delivered November 4, 1963.

*Lyle Williams, A. W. Nisbet* and *Henry Ginger,* for appellant.

*Paul Sullins* and *Griffin Smith, Gaughan & Laney* and *Bridges, Young* and *Matthews,* for appellee.

FRANK HOLT, Associate Justice. The main question presented in these consolidated cases is whether the use

tax exemption provided by statute is applicable to the purchase of turbine generators which are being used by both appellees, Georgia-Pacific Paper Corporation and International Paper Company, in their respective operations of manufacturing or producing paper products. Georgia-Pacific Paper Corporation claims additional exemptions on its purchase of such items as anion resin, a sewer cleaning ball, miscellaneous conveyors, two small turbines, a towmotor and carrier, and recorder chart rolls. The appellant, the Commissioner of Revenues, levied an assessment in the sum of $30,935.84 against Georgia-Pacific Paper Corporation based upon the turbine generator plus the other enumerated items. The use tax assessment levied against International Paper Company was upon the turbine generator only in the amount of $27,063.69, or three per cent (3%) of the recent purchase price of $1,908,549.04. The penalties were waived. The assessment against the International Paper Company was paid under protest and action was brought against appellant to recover this sum paid under protest on the basis the turbine generator is exempt from the use tax. Appellee, Georgia-Pacific Paper Corporation, sought an injunction to restrain the Commissioner of Revenues from further proceedings to collect the tax assessed against it and sought a Declaratory Judgment to establish that the above named items are primary facilities used directly in their manufacturing or processing operation and therefore, exempt pursuant to Ark. Stat. Ann. § 84-3106 (Supp. 1961). This statute provides in pertinent part as follows:

"84-3106. Exemptions.—There are hereby specifically exempted from the taxes levied in this Act [§§ 84-3101—84-3128]: * * *

Manufacturing or processing machinery, replacement parts, materials, and supplies used directly in the manufacturing or processing operation provided; such materials, machinery, supplies, and equipment are not available within this State by reason of not being manufactured or produced within Arkansas; or are not available from instate sellers' or suppliers' stocks in trade

within this State. It is the intent of this subsection to exempt only such equipment, machinery, materials, or supplies that constitute the primary facility engaged in the direct production, processing or manufacturing of articles of commerce at industrial and processing plants in Arkansas and which are not available from the seller's regularly maintained stock in this State.

The terms 'manufacturing' and 'processing' as used herein, refer to and include those operations commonly understood within their ordinary meaning and shall include mining, quarrying, refining, and the production of natural resources, cotton ginning, and rice drying. Hand tools, buildings, transportation equipment, expendable items, office machines and supplies, and all other materials which are incidental or useful in connection with the manufacturing or processing operations and not directly used in the primary production processing or manufacturing are not included or classified as exempt.''

The appellant controverted the claimed exemptions. The cases were consolidated for trial by agreement.

In the case of Georgia-Pacific Paper Corporation, the Chancellor found that ''the items on which the tax is sought are all directly used in the manufacturing or processing operation, within the meaning of the exemption.'' As to International Paper Company, the Court found ''that the 20,000 K.W. steam turbine generator as employed in the Pine Bluff Mill of the plaintiff is a primary facility used directly in the processing and manufacturing operation of making wood, pulp and paper * * * that it is exempt from * * *'' the use tax.

On appeal appellant relies for reversal upon four points which are aptly encompassed by appellant's statement that:

''The question as to all of the above mentioned articles is whether or not such are directly used in manufacturing or processing within the meaning of the compensating tax exemption statute, Ark. Stat., Sec. 84-3106 (D) (Pocket Supp.) * * *''

There appears to be no dispute about the fact that these items were unavailable for purchase in Arkansas.

The appellant does, however, strenuously dispute that the evidence presented by the appellee was sufficient to bring the questioned items within the purview of the statue. We agree with appellant that the burden is on appellees to clearly show they are entitled to the exemption from the use tax. There is no implied exemption from a tax and a claimant must clearly establish an exemption, since taxation is the rule and exemption the exception. *Biscoe* v. *Coulter*, 18 Ark. 423; *Scurlock* v. *Henderson*, 223 Ark. 727, 268 S. W. 2d 619. With this rule of law in mind, we now proceed to review the pertinent facts as adduced by the testimony in the cases at bar.

In the Georgia-Pacific Paper Corporation plant the logs are debarked in a "barking drum." The debarked logs are moved to a knife clipping machine where they are cut into small chips. The wood chips are placed in a silo for storage. They are withdrawn as needed and loaded into "digesters" where a cooking liquor compound is mixed with the chips. The "digester" is closed and then steam pressure at 160 pounds is admitted from the turbine generator. The chips are cooked for three hours at 100 pounds pressure. This dissolves the bonding material that holds the cellulose together in the wood. When the cooking is complete, then the cellulose fibers known as pulp remain. The pulp is then further washed and screened in the assembly line process. The wood fiber or pulp, in a suspension of water, is delivered to the paper making machines. These machines have continuous fine mesh bronze wire which holds the cellulose on the wire while permitting the water to drain through this mesh. The fibers form a mat on top of this mesh screen. It is pressed to further remove moisture and then goes into and around a series of heated cylindrical driers. These driers operate under 40 to 60 pounds of steam pressure received from the turbine generator. The purpose is to further dry the product, the mat of fibers, into a finished sheet of unbleached paper such as paper for newsprint and telephone directories. A further process is required to produce bleached pulp

from which is made a heavier, stronger product such as milk cartons and drinking cups.

There are several boilers which utilize as fuel the waste material such as the bark, the chipper residue and the concentrated spent cooking liquor from the "digesters." This fuel is used to generate steam in the boilers at 850 pounds pressure. The steam is then funneled to the turbine at this high pressure. As the steam passes through the turbine, turning parts of it, the energy is gradually spent or the steam pressure reduced. At the reduced level of 160 pounds pressure some of the steam is extracted and supplied to the "digesters" for the cooking of the pulp. The balance of the steam continues on through the turbine until the pressure level is further reduced to 60 pounds. At this point some of the steam is further withdrawn and funneled to that portion of this assembly line process where it is used in drying, evaporation in the tubular heat exchangers and various other applications. As the turbine is turning because of the steam pressure, thus reducing the pressure, it drives the generator which generates the electricity. Thus it provided the motive power for the various machines, pumps and other equipment in the paper making process. Therefore, the turbine generator performs a dual function. It utilizes the steam to generate electrical energy and in so doing it reduces the steam pressure and emits it at certain levels to component parts of the paper manufacturing process where it is used for various purposes, such as cooking, drying and heating.

The turbine generator in the plant of International Paper Company performs basically the same functions. The steam pressure enters the turbine from the boilers at 1,250 pounds where it is reduced and discharged to component parts in the mill at pressure levels of 400, 140 and 60 pounds. This machine was built according to specifications to fit a particular need. Thirty-two per cent (32%) of the steam entering the turbine is consumed in generating electricity. The balance of sixty-eight per cent (68%) is processed to proper pressure levels by the turbine and thence flows directly to various

applications in the paper making process. Only approximately one-half (½) of one per cent (1%) of the electricity generated by the turbine is used in the mill for such needs as lighting and air conditioning.

The tenor of the appellees' evidence was that in modern paper mills the turbine generator is a facility of primary importance in fulfilling the unique requirements of a continuous and unitary mechanical operation. It is undisputed that the use of steam turbine generators creates a balance between two forms of energy in the paper making process,—steam for cooking, heating, evaporation and drying—electricity for motive power. Although appellant presents a forceful and persuasive argument, we think the Chancellor was correct in his findings that these turbine generators, as employed and used by appellees, are clearly primary facilities used directly in the processing and manufacturing of paper products and, therefore, exempt from the use tax. Certainly it cannot be said his findings are against the clear preponderance of the evidence.

Appellant contends that the function of the turbine generator is a separate and distinct process and is completed before the manufacturing of the paper actually begins. Appellant relies on *Scurlock* v. *Henderson, supra,* where it was held that ginning cotton is not a manufacturing process. We do not consider this case in point. When cotton is ginned it is still raw cotton without the seed. In the case at bar the entire process, including the turbine generator, converts a raw material into a finished product which is taxed when it enters commerce. It is significant that at the next legislative session following the *Henderson* decision the statute was amended to exempt cotton ginning.

There is compelling evidence in this case by recognized authorities that a steam turbine generator is such a necessary facility to a modern paper mill that one would not be constructed without such machinery. Each of these turbine generators is located in the very heart of the manufacturing process and performs much the

same function as the mainspring of a watch. Appellant quotes from Black's Law Dictionary (4th Ed.) that:

"Primary is defined as 'First; principal; chief; leading.' Primary Purpose is defined as 'That which is first in intention; which is fundamental'."

Applying this definition it seems apparent to us that the steam turbine generator is a primary facility in the paper manufacturing process. If the turbine generator were removed the manufacturing operation would cease.

Other jurisdictions have construed turbine generators to be machines used "directly" in a manufacturing process and thus exempt. *Allis-Chalmers Mfg. Co.* v. *Iowa State Tax Comm.,* (Iowa) 92 N. W. 2d 129; *City of Ames* v. *State Tax Commission,* (Iowa) 71 N. W. 2d 15; *Niagara Mohawk Power Corp.* v. *Wanamaker,* (N. Y.) 144 NYS (2) 458; *Youngstown Building Material and Fuel Co.* v. *Bowers,* (Ohio) 149 N. E. 2d 1. In the *Allis-Chalmers* case it was said:

"This turbine generator not only makes the electricity but furnishes steam which passes through it for * * * processing."

Under any fair construction of our statute, giving the word "direct" a reasonable meaning in the cases at bar, we think the turbine generators are being directly used as primary facilities in the manufacture of paper products. To hold otherwise would be too narrow a construction and an unreasonable refinement.

In construing the legislative intent we not only look to the language of the statute but to the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the contemporaneous legislative history or other appropriate matters that throw light on the intent of the legislature. *Arkansas State Highway Comm.* v. *Mabry,* 229 Ark. 261, 315 S. W. 2d 900. In *Morley* v. *Brown & Root, Inc.,* 219 Ark. 82, 239 S. W. 2d 1012, we said:

"There can be little doubt that the desire of the Legislature to encourage new industries to locate in the

State prompted the passage of this exemption section, and it is proper to view and interpret the section in that light.''

We think it is manifest that our legislature clearly intended to exempt such machinery as these turbine generators when they are an integral part of the plant, employed and used in a manufacturing process such as in the cases at bar.

We have carefully reviewed the statutory rules of construction and the cases cited by appellant. Although ably presented, we do not consider them to be controlling in the cases at bar.

Appellee, Georgia-Pacific Paper Corporation, contends that certain miscellaneous items are also exempt from the use tax. Among these items are two small turbines. They are usable in driving fans that create the draft for the boiler and in pumping ''feed water'' to it. These turbines are used to drive some of the auxiliary equipment in the boilers and cause them to function. It appears that these small turbines are not readily adaptable to interchange or relocation between mills. We consider these turbines to be such an integral part of the functional system of the paper manufacturing process that they are also exempt for the reason we have heretofore given.

Appellant contends that the remaining items are excluded, or not clearly exempted by the terms in the last paragraph of § 84-3106 (D) [Ark. Stat. Ann. (Supp. 1961)] which reads as follows:

''* * * Hand tools, buildings, transportation equipment, expendable items, office machines and supplies, and all other materials which are incidental or useful in connection with the manufacturing or processing operations and not directly used in the primary production processing or manufacturing are not included or classified as exempt.''

Anion resin is a material to soften water and remove impurities from it before it goes into the boiler.

This tends to prevent "scaling up" of the boilers. The sewer cleaning ball is a rubber ball with fins which is placed in the water lines at the water wells and washed through the lines for a distance of approximately five or six miles to the plant. These balls are used to clear any accumulated debris from the lines. The miscellaneous conveyors are used in moving waste material from a storage bin at the lumber mill into a mechanism that feeds a pneumatic conveyor which blows the waste material over to the paper mill. The waste material is then used as fuel for the boilers. The towmotor and carrier item is used to transport material between processes in the plants. The recorder chart rolls are information devices which are used to record the functioning of plug making equipment. They are information devices only.

As stated, this court has consistently held that the burden is on the taxpayer to establish clearly that the legislature intended the claimed exemption since taxation is the rule and exemption the exception. An exemption cannot be implied. *Biscoe* v. *Coulter, supra; Scurlock* v. *Henderson, supra; McCarroll* v. *Mitchell,* 198 Ark. 435, 129 S. W. 2d 611; *Wiseman* v. *Ark. Wholesale Grocers' Assn.,* 192 Ark. 313, 90 S. W. 2d 987, and *Hilger* v. *Harding College, Inc.,* 231 Ark. 686, 331 S. W. 2d 851. We do not think the appellee, Georgia-Pacific Paper Corporation, has sufficiently met the burden of proof required of it as to these miscellaneous items being exempt. However, we do not mean to say that under all circumstances such items could never be exempt.

In the case of the Georgia-Pacific Paper Corporation, the decree is affirmed as to the turbine generator and the two small turbines; the decree is reversed as to the remaining items [anion resin, sewer cleaning ball, miscellaneous conveyors, towmotor and carrier, and recorder chart rolls] and the cause remanded with directions to enter a decree not inconsistent with this opinion.

The decree is affirmed as to International Paper Company.

This being an equity case, we adjudge all costs against the appellant.

In the opinion of Justice Robinson the balance of these miscellaneous items comes within the purview of the statute and are, therefore, exempt from the use tax.

Harris, C. J., not participating.