ARKANSAS RAILWAY EQUIPMENT COMPANY v. Richard R. HEATH, Director, DEPARTMENT OF FINANCE AND ADMINISTRATION

74-202                                    519 S.W. 2d 45

Opinion delivered February 24, 1975

*Rose, Nash, Williamson, Carroll* and *Clay,* by: *James H. Wilkins, Jr.,* for appellant.

*Karl Glass* and *Harlin R. Hodnett,* for appellee.

CONLEY BYRD, Justice. At issue here is whether appellant Arkansas Railway Equipment Company is entitled to a use tax exemption pursuant to Ark. Stat. Ann. § 84-3106 (D) (2) (Supp. 1973), upon the purchase of two diesel locomotive cranes and a 72 inch Ohio magnet. The trial court denied appellant's claimed exemption on the basis that it had failed to clearly show that:

"A. Such equipment is used in producing, manufacturing, fabricating, assembling, processing, finishing or packaging of articles of commerce.

"B. Such equipment is not transportation equipment."

To sustain the action of the trial court, appellee Richard R. Heath, Director, Department of Finance and Administration, State of Arkansas, contends:

1. The appellant's operation is not "manufacturing." It is commonly understood as, and falls precisely within the definition of a "salvage" operation. Nor does the appellant assemble or fabricate a finished product from "raw or semi-fnished materials."

2. The machinery and equipment is not used "directly" within a manufacturing process. The word "directly" means that the machine must fabricate or assemble a new product from raw or semi-fnished materials. Since there are no raw or

semi-finished materials, only an old railroad tank car, used in the appellants' operation, it is impossible for the appellant to meet this statutory requirement.

3. Additionally, the cranes and magnet are used only to "transport" the metal tank from one work site to another. The Arkansas Compensating Tax Act specifically excludes such equipment from use tax exemption.

The record shows that appellant through its processing of old railroad tank cars makes and sells culverts fabricated therefrom in competition with manufacturers of corrugated metal culverts. The nature of appellants' business operations and the facts and circumstances which gave rise to this litigation were stipulated in the trial court as follows:

"a. In late 1970, the American Association of Railroads issued a ruling, effective January 1, 1971, requiring its members to remove from interchange service all railroad cars in excess of fifty years of age. This ruling went on to provide that, effective January 1, 1972, all railroad cars forty-nine and fifty years of age would be similarly retired, and each subsequent January 1, two more years of cars would be removed from service, until no cars in excess of forty years of age would remain in service. One result of the above ruling was to place a substantial number of railroad cars on the market for sale and the most significant purchasers of such railroad cars were salvage companies such as Arkansas Railway Equipment Company (hereinafter 'Plaintiff'). In early 1971, Plaintiff purchased 1,500 railroad tank cars. At that time, Plaintiff was one of the few operations in the United States with sufficient tract capacity to permit the storage of such a volume purchase. All of the 1,500 tank cars so purchased were being retired from service pursuant to the above-mentioned ruling of the American Association of Railroads.

b. The tanks which are mounted on such railroad tank cars have capacities of from 8,000 to 10,000 gallons and are of four basic types:

(1) insulated;

(2) insulated with heating coils;

(3) non-insulated; and

(4) non-insulated with heating coils.

For the most part, the tank cars purchased by Plaintiff were of types (2) and (3). The heating coils are a network of tubing inside the tank and are used to carry steam to soften heavy petroleum products in order to drain such products from the tanks. The insulation, of course, is for the purpose of heat retention in the draining process. Examples of such petroleum products include asphalt, paraffin and wax.

c. The most significant portion of Plaintiff's business in 1971 and 1972 was the production and sale of drainage culvert from these railroad tank cars. Because of the market conditions created by the above-mentioned ruling, Plaintiff was able to produce a longer-lasting product than competing items, — corrugated culvert — while selling that product at a lower price than the competition. Plaintiff's principal customers for such culvert were local governments or road contractors who used the culvert for street and highway drainage and farmers who used such products for field drainage. The cranes and magnets which are the subject of this litigation were purchased by Plaintiff for the specific purpose of engaging in business of this nature.

d. In producing this culvert, the following operations are performed upon the railroad tank cars:

(1) The first step required is delivery of the cars to the work site. This is a switching operation which involved moving several cars simultaneously to the work site. The crane that is most conveniently located performs this function. The total time involved in such switching operation is approximately 30 minutes and, in the aggregate, amounts to approximately 5% of the cranes' work time.

(2) Upon arrival at the work site, the tank is cleaned to remove all residual hydrocarbons. This is a safety measure made necessary because subsequent operations

on the tank include the use of an acetylene torch which would render the operation hazardous because of fire, absent such cleaning.

(3) After the cleaning, the straps which secure the tank to the undercarriage of the railroad car are cut and the tank is lifted to the ground by the crane.

(4) In the case of an insulated tank, there is a thin metal shell which surrounds the tank and encases the insulation. An acetylene torch operator cuts the shell horizontally and the crane lays open, the two halves of the shell. Once open, one or more laborers scrape the insulation from the shell and pile it for disposal. The two shell halves are than removed from the work site by the crane and magnet and the shell is sold as scrap.

(5) The next step in converting the tank car into culvert consists of cutting the ends out of the tank, removing the coils, if any, and removing the dome of the tank. The crane is used to roll and reposition the tank to facilitate such cutting. The crane is also used in conjunction with the magnet or with cable in removing the coils.

(6) The crane then picks up the unprepared culvert and moves it to an area where a welder can repair and patch both the dome hole and the coil attachment hole. In some cases the crane is also used for positioning two prepared culverts so that they may be welded together, resulting in a culvert that is 60 feet long, rather than the conventional 30 feet.

(7) Finally, the crane is used to load the finished culvert aboard trucks for delivery.

e. During 1971 and 1972, approximately 80% of Plaintiff's business was performed substantially as described above. During late 1972 and early 1973, with the advent of the fuel shortage, some sales of tanks, adapted for stationary use, were made. In such cases, the dome was removed, the coils, if any, were removed

and the resulting holes in the tank were patched. Then the tank was adapted for conventional filling and emptying and sold for use as a storage facility for such products as gasoline, kerosene or diesel fuel. Of the 1,-924 tank cars purchased by Plaintiff, 71 were refurbished as above and sold as stationary tanks.

f. The balance of the 1,924 tank cars, when delivered to Plaintiff, were in such poor condition (752 cars) that Plaintiff either used them to patch the holes in tanks or culvert or Plaintiff cut them up for sale as scrap.

g. The primary purpose in Plaintiff's purchase of the cranes and magnets and the primary use of the same was the production of culvert from the tank cars, as described above. The loading of scrap and the switching of tank cars to the work area were incidental to the primary business of Plaintiff and incidental to the primary use of such equipment."

The statutory exemption here involved is set forth in Ark. Stat. Ann. § 84-3106 (D) (2) (Supp. 1973), as follows:

*"Exemptions.*—There are hereby specifically exempted from the taxes levied in this Act:

(D) (2) Machinery and equipment used directly in producing, manufacturing, fabricating, assembling, processing, finishing, or packaging of articles of commerce at manufacturing or processing plants or facilities in the State of Arkansas, but only to the extent that such machinery and equipment is purchased and used for the purposes set forth in this subsection.

(a) Such machinery and equipment will be exempt under this subsection if it is purchased and used to create new manufacturing or processing plants or facilities within this State or to expand existing manufacturing or processing plants or facilities within this State.

\* \* \*

(c) It is the intent of this subsection to exempt only such machinery and equipment as shall be utilized directly in the actual manufacturing or processing operation at any time from the initial stage where actual manufacturing or processing begins through the completion of the finished article of commerce and the packaging of the finished end product. The term 'directly' as used in this Act is to limit the exemption to only the machinery and equipment used in actual production during processing, fabricating or assembling raw materials or semi-finished materials into the form in which such personal property is to be sold in the commercial market. Hand tools, buildings, transportation equipment, office machines and equipment, machinery and equipment used in administrative, accounting, sales or other such activities of the business involved and all other machinery and equipment not directly used in the manufacturing or processing operation are not included or classified as exempt.

* * *

(e) For the purposes of this subsection, the term 'manufacturing' and/or 'processing', as used herein, refer to and include those operations commonly understood within their ordinary meaning, and shall also include mining, quarrying, refining, extracting oil and gas, cotton ginning, and the drying of rice, soy beans and other grains."

POINT I. To deny the exemption the Director takes the position that an old railroad tank car is neither raw material nor semi-finished material within the meaning of the statute, *supra*, and furthermore, the appellant's operation is one which is commonly understood as a "salvage operation." We disagree with both contentions. In the first place the Director has given us no authority and we know of no authority that would exclude an old railroad tank car from being "raw or semi-finished materials" to a culvert manufacturer. In fact, in view of the ruling by the American Association of Railroads, the old tank cars would have been only so much scrap iron had not appellant through its ingenuity and labor fabricated

a cylinder therefrom that could be used as a culvert. Furthermore, appellant's operation is not the common or ordinary salvage operation where a product is disassembled and sold as used parts, for in this instance the appellant through its fabrication forms a culvert that actively competes in the market with culverts made from corrugated metal — the Director concedes that the persons engaged in the fabrication of corrugated metal culverts are engaged in the manufacturing process within the meaning of the exemption.

Consequently, we conclude that under the stipulated facts, appellant is a manufacturer of culverts within the meaning of the tax exemption, *supra.*

POINT II. The Director's contention that the locomotive cranes and the 72 inch magnet are not used "DIRECTLY" in manufacturing is contrary to the position we took in *Cheney, Commissioner v. Georgia-Pacific Paper Corp.,* 237 Ark. 161, 371 S.W. 2d 843 (1963). We there held that a piece of machinery was "directly" used in the manufacturing process when the item was an integral part of the plant and the removal of the item would stop the operation. The machinery here involved is not only an integral part of the operation but the operation in fact could not be performed without the use of the machinery.

POINT III. Finally the Director contends that the machinery here involved is not exempt because it is transportation equipment. In doing so he relies upon *Heath v. Midco Equipment Co.,* 256 Ark. 14, 505 S.W. 2d 739 (1974). In that case we held that dump trucks used to transport rock from the quarry site to the rock crusher were not exempt because they came under the classification of "transportation equipment" which was excluded by the last sentence in Ark. Stat. Ann. § 84-1904 (r) (2) (c) (Supp. 1973). Of course the dump trucks there could not have been classified as "only the machinery and equipment used in the actual production during processing, fabricating or assembling raw materials or semi-finished materials" because (1) they were not an integral part of the operation and (2) they were only used for the transportation of the rock from the quarry site to the processing site and during that time no processing or

fabricating occurred. Here however, the machines are used as tools not only to move but to hold and position the old railroad tank cars during the time that the culverts are being fabricated and as such tools the machines are a necessary and integral part of the operation. While "transportation equipment" is obviously a mode of conveyance it does not necessarily follow that every mode of conveyance is "transportation equipment" within the meaning of the statute. Thus we find from the stipulated facts that the trial court erred in classifying the machinery here involved as "transportation equipment."

Reversed and remanded.

HARRIS, C.J., and JONES, J., dissent.