Charles D. RAGLAND, Commissioner of Revenues
*v.* DELTIC FARM & TIMBER COMPANY, INC.

85-249                                          708 S.W.2d 90

Supreme Court of Arkansas
Opinion delivered April 28, 1986
[Rehearing denied May 27, 1986.*]

---

* Purtle, J., not participating.

*Kelly S. Jennings*, for appellant.

*James E. Baine*, for appellee.

GEORGE ROSE SMITH, Justice. This is a use tax case. The appellant, the Arkansas Commissioner of Revenues, assessed a tax deficiency against the appellee, Deltic, on the theory that a use tax should have been paid on Deltic's purchase of a large crane. Deltic claimed that the purchase was a tax exempt transaction, because the crane is used in the manufacture of lumber and of wood chips, the latter being eventually sold to paper mills. Ark. Stat. Ann. § 84-3106(D)(2) (Repl. 1980). The Commissioner denied the exemption, holding that the crane is not used in the manufacturing part of Deltic's business, or if so, the crane is not used "directly" in manufacturing, as the statutory exemption requires.

Deltic paid the tax under protest and brought this action for its recovery. The chancellor rejected the Commissioner's contentions and directed a refund of the tax. The appeal comes to this court as presenting an issue of statutory construction. Rule 29(1)(c).

The facts are not seriously in dispute. From 1973 until 1979 Deltic conducted only a sawmill operation in which it sawed logs into lumber and sold the lumber to wholesalers. Owing to economic conditions the sawmill became so unprofitable that Deltic was forced to consider going out of business. Deltic decided to solve its problem by purchasing low-grade timber, referred to as "stumpage," which would be used as much as possible for the production of lumber, with the rest being used in the production of high-quality wood chips.

Deltic put its plan into effect by constructing a $3.2 million "merchandiser," which is a physical plant that was built next to the sawmill operation and supplements that facility. The entire merchandiser was considered by the Commissioner to be tax exempt except for the crane now in question. That crane, bought for $572,519, is set in concrete and serves the merchandiser primarily and the sawmill secondarily.

Stumpage is brought in trucks from the woods to Deltic's plant. Stumpage that is already cut to sawmill length is unloaded at the sawmill department and is used in the manufacture of lumber, as before. Trucks also bring in low-grade stumpage of tree length rather than of sawmill length. The crane lifts those logs to a height of perhaps 14 feet and places them on the "cut-up deck" of the merchandiser. The chancellor's order describes the cut-up process in this language:

> The merchandiser cuts part of the low-grade stumpage which is in tree lengths into sawlog lengths ready for cutting into lumber and the rest of the stumpage is used for the production of high-quality chips that must meet rigid quality standards. By cutting the stumpage into sawlog lengths, the first step is avoided in the lumber department of the plant where high-quality tree-length stumpage is first cut into sawlog lengths. This first cut into sawlog lengths at the merchandiser is as important and requires as much skill as the remaining cutting determinations in the manufacturing of lumber.

The stumpage that has been cut in the merchandiser to sawmill length is carried, apparently not by the crane, to the sawmill to be made into lumber. The rest of the low-grade stumpage is debarked in the merchandiser, cut into chips, and sorted as to size. The chips must meet certain specifications, have less than 1% bark, and be free from soil and other objectionable substances. A Deltic witness testified that making pulpwood chips is not just a matter of haphazardly cutting the log into little particles; a rigid specification by the paper mill must be met. The witness said: "I personally think we manufacture those chips." The chips are sold to five different paper mills, one of which requires hardwood chips.

The chancellor seems to have found that the chips are in fact

manufactured, as the lumber admittedly is, for his order states: "After stumpage arrives at the mill it is moved through a continuous process that produces an end result of finished lumber and high-quality chips." With regard to what is essentially an issue of fact, we cannot say that the chancellor's finding is clearly erroneous. Further, the crane plays a part not only in the manufacture of the chips but also in the production of lumber, in that a substantial part of the stumpage that the crane lifts to the cut-up deck is first cut to sawlog length there and then is made into lumber at the sawmill department.

The Commissioner also argues that even though the crane may play a part in the manufacture of lumber and chips, the crane is not used "directly" in manufacturing. Deltic's proof, which is not contradicted, shows pretty clearly that the sawmill department could not operate without the merchandiser department, and vice versa. The chancellor described the whole Deltic plant as an integrated operation. His order goes on to say:

> The use of low-grade stumpage (tree-length pulp-wood) through the merchandiser is necessary for the economics to allow the plant to operate and without the merchandiser operating, the Company could not for economic reasons justify continuing to operate the plant. Without the merchandiser department the plant could not use low-grade stumpage since the time element in cutting the stumpage would be too great, slow down the lumber department operation, and divert resources from producing finished lumber. . . .

> Economics require that the merchandiser be operated, and without it working with the rest of the plant in a continuous, well-synchronized operation, the cost of raw materials would be too high to allow the plant to continue to operate. . . .

> Economics would not allow the merchandiser to operate without the use of the crane. The primary function of the crane is to commence the manufacturing process by moving stumpage from the storage area onto the deck of the merchandiser where tree-length stumpage is cut. . . .

It is the opinion of this Court that the crane in

question was used directly in producing the finished end product into the form in which it was sold in the market, and consequently was exempt.

■ . Our decision in *Cheney* v. *Georgia Pacific Paper Corp.*, 237 Ark. 161, 371 S.W.2d 843 (1963), is pertinent. There a turbine generator was used to generate electricity for the paper mill and to supply steam that was used in the paper-making process. We said that "it seems apparent to us that the steam turbine generator is a primary facility in the paper manufacturing process. If the turbine generator were removed the manufacturing operation would cease." That case was followed in another not unlike this one, *Arkansas Ry. Equipment Co.* v. *Heath*, 257 Ark. 651, 519 S.W.2d 45 (1975). There we applied the use tax exemption to two diesel locomotive cranes that were used to move and to hold old railroad tank cars that were being made into highway culverts. In holding that the cranes were used directly in manufacturing the culverts we reasoned: "The machinery here involved is not only an integral part of the operation but the operation could not be performed without the use of the machinery." Those observations are equally applicable to Deltic's crane.

■ The Commissioner stresses our settled rule that tax exemptions are strictly construed, that to doubt is to deny the exemption, and that therefore the exemption must be established beyond a reasonable doubt. That principle applies especially to the trial courts, who hear the testimony and determine issues of credibility. Even in tax exemption cases, however, we review the chancery court's findings de novo and reverse only if they are clearly against the preponderance of the evidence. *Arkansas Beverage Co.* v. *Heath*, 257 Ark. 991, 993, 521 S.W.2d 835 (1975). Here the chancellor's findings and conclusions are not clearly erroneous.

Affirmed.

PURTLE, J. not participating.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I disagree with the majority's approval of the test applied by the chancellor, i.e., that the crane is a necessary part of the operation on the basis of economics. There is no authority for this rationale. The chancel-

lor was analogizing to tests in our decisions used to determine whether certain machinery was "directly" used in manufacturing. The test, however, was applied to the *mechanics* of the manufacturing operation and not the economics: If a particular piece of equipment or machinery were removed from the manufacturing process, would the operation come to a *physical* halt? *Arkansas Rwy. & Equip. Co. v. Heath*, 257 Ark. 651, 519 S.W.2d 45 (1975); *Cheney v. Georgia-Pacific Corp.*, 237 Ark. 161, 371 S.W.2d 843 (1963).

The *Cheney* case, *supra*, which the majority cites as pertinent to this issue had nothing to do with economics. The turbine in question was used to generate electricity for the plant, but the steam from the turbine was also directly used in the paper making process of the plant. The physical operation of the plant was dependant on the turbine for its operation, not the economic viability of the plant.

Nor does the language of the statute creating the exemption give any indication that the legislature intended such an interpretation. The language is clear and straightforward:

> Ark. Stat. Ann. § 84-3106. There are hereby specifically exempted from the taxes levied in this Act:
>
> (D)(1) * * *
>
> (2) Machinery and equipment used directly in producing, manufacturing, fabricating, assembling, processing, finishing, or packaging an article of commerce. . .

Ark. Stat. Ann. § 84-3106(D)(2)(c) provides:

> It is the intent of this subsection to exempt only such machinery and equipment *as shall be utilized directly in the actual manufacturing or processing operation at any time from the initial stage where actual manufacturing or processing begins through the completion of the finished article.* . .The term "directly" as used in this Act is to limit the exemption *to only the machinery and equipment used in actual production during processing, fabricating or assembling raw materials or semifinished materials into the form in which such personal property is to be sold in the commercial market.*

The statute is obviously concerned with limiting the exemption to the *actual* manufacturing process and the language doesn't begin to embrace the meaning the chancellor and the majority have given it. Furthermore, any exemption provision must be strictly construed *against* the exemption and to doubt is to deny the exemption. *C & C Machinery* v. *Ragland*, 278 Ark. 629, 648 S.W.2d 61 (1983); *Ragland* v. *Ark. Writer's Project*, 287 Ark. 155, 697 S.W.2d 94 (1985).

I find no support for the majority position under the statute or our prior cases. The issue I believe is whether a piece of equipment which is used preliminarily to the manufacturing process will be considered as being used "directly" in the "actual manufacturing process." The clarification provided by the legislature in § 84-3106(D)(2)(c), would indicate not. Neither would our prior cases. *Ark. Rwy. & Equip. Co.* v. *Heath, supra,* cited by the majority as being similar, is readily distinguishable. In *Heath,* the cranes were used to unload old railroad cars that were converted into culverts. However, the cranes were also used throughout the manufacturing process to hold the cars and reposition them as the transformation process took place. The initial part of the crane's function of unloading the cars comprised only five percent of its total work time.

The chancellor also had before him regulations and a policy statement promulgated by the Commissioner which was in effect during the time of the audit and which further delineated the meaning of "directly":

> Machinery and equipment used in actual production include machinery and equipment that meet all other applicable requirements and which cause a recognizable and measurable mechanical, chemical, electrical or electronic action to take place as a necessary and integral part of manufacturing, the absence of which would cause the manufacturing operation to cease. "Directly" does not mean that the machinery and equipment must come into direct physical contact with any of the material that become necessary and integral parts of the finished product. *Machinery and equipment which handle raw, semifinished or finished materials or property before the manufacturing process begins are not utilized directly in*

*the manufacturing process.*

The above regulation was enacted as an amendment to § 84-3106 by the 1985 legislature.

While I think the plain language of our statute is clear enough to eliminate the crane from exemption status, should there be any doubt, it must be resolved against allowing the exemption.