A. B. HERVEY JR., COMMISSIONER OF REVENUE, *v.* TYSON'S FOODS, INC. ET AL

5-5867                                    480 S.W. 2d 592

Opinion delivered May 29, 1972
[Rehearing denied June 26, 1972.]

R. *David Lewis* and *Dewey Moore Jr.,* for appellant.

*Crouch, Blair, Cypert & Waters,* by *James B. Blair,* for appellees.

LYLE BROWN, Justice. This action was instituted by Tyson's Foods, Inc., and its wholly owned subsidiary, Tyson's Feeds, Inc., poultry processors and distributors, to recover gross receipts taxes (sales) and compensating (use) taxes paid under protest. (Throughout the opinion the appellees will be referred to as Tyson.) The audit forming the basis of tax assessments herein treated was for a four-year period. The chancellor held that Tyson was entitled to prevail and recover the full amounts paid under protest. The State Revenue Commissioner appeals.

Item I claimed for exemption is based on Ark. Stat. Ann. § 84-1924 (Repl. 1960), which is a feedstuffs exemption statute. It provides that "all feedstuffs used in grow-

ing or producing livestock and/or poultry" are exempt from sales tax. Then § 84-1925 (d) defines "feedstuffs" to mean all materials which are commonly known and used as feed for livestock and/or poultry. The items claimed are called "water feed additives," being fed to the birds through the drinking water rather than mixing with bulk feed, the latter process being ofttimes impracical. Tyson's total purchases of additives amounted to $706,763.41. There are several such additives. Tyson's witness described them. Vitamin D3 and Vitamin A are used to obtain maximum growth efficiency. Gallimycin, Terramycin, and Aureomycin belong to the mycin drug family. Funjol is a copper sulfate compound used to prevent mycotic infections. Alpha and Amprol are cocci-diostats, added for the prevention of certain infectious diseases. The same is true of Floxaid and Vitalizer. Whit-syn S, S-Q, and S4 are sulpha drugs, used in the treatment of various diseases. Three-Mitro is an inorganic arsenical compound used to promote growth and feed efficiency. Feed efficiency is described as meaning the poultry's ability to convert feed to body pounds.

We have been referred to only one case which deals with the classification of feed additives. *Lipman Poultry Co.* v. *Johnson, Assessor,* 138 Atl. 2d 631 (Me. 1958). There the court was called upon to determine whether certain additives came within a tax exemption statute covering feeds. The components were terramycin oil suspension, terramycin animal formula, terramycin poultry formula, and a hormone preparation called "capette pills." There it was held that those antibiotics and hormones functioned not as feed but as catalysts to assist in assimilation of food.

According to the description of these drugs and their uses, it is reasonable to say that by their use alone they would not supply sufficient nourishment while, on the other hand, when these ingredients are administered in conjunction with poultry feed, the result is an accelerated growth of the birds.

There seems to be no place in the definition of feed

as used in the statute for the inclusion of antibiotics and hormones.

It was also pointed out that the additives were used as catalysts in the body to help other reactions take place; that they never become a part of the body frame; and that when they have served their usefulness they are excreted and another supply is then needed.

In *Peterson Produce Co. v. Cheney,* 237 Ark. 600, 374 S.W. 2d 809 (1964), we said: "Let it also be remembered that a tax exemption must be strictly construed, 'and to doubt is to deny exemption.' " In *Wiseman v. Madison Cadillac Co.,* 191 Ark. 1021, 88 S.W. 2d 1007 (1935), we held that the burden is on the claimant "to establish clearly his right to exemption."

In the first place we have reasonable doubt that these additives are commonly known as feedstuffs. Secondly, appellee has not met the burden of clearly showing the right to exemption.

Item II claimed as exempt from sales tax is described by appellees as components "consumed as integral part of the production of broilers." Under that heading they list the specific items of nest pads, feeder lids, filter flats, litter, vaccine and medicine, and spray. The exemption is claimed under Ark. Stat. Ann. § 84-1904 (Repl. 1960): "Goods, wares, merchandise, and property sold for use in manufacturing, compounding, processing, assembling or preparing for sale, can be classified as having been sold for purposes of resale or the subject matter of resale only in the event such goods, wares, merchandise, or property becomes a recognizable, integral part of the manufactured, compounded, processed, assembled or prepared products." We do not agree with appellees simply because we are unable to conceive that the items listed become a recognizable, integral part of the finished products.

For the last four months of the audit exemption is

claimed for the listed Item II under the Acts of 1967, Act 113. The section does not appear in the annotated statutes because it is no longer the law. There the exemption provision says: "Gross receipts or gross proceeds derived form the sale of. . .tangible personal property used for repair, replacement, or expansion of existing manufacturing or processing facilities . . ." Manufacturing and processing have been held not to be two distinct operations. Processing is carried out under the manufacturing process. *Pellerin* v. *Cheney*, 237 Ark. 59, 371 S.W. 2d 524 (1963). The taxpayer must first qualify as a manufacturer. *Scurlock* v. *Henderson*, 223 Ark. 727, 268 S.W. 2d 619 (1954). We have specifically held that a processor of chickens is not a manufacturer. *Peterson* v. *Cheney*, 237 Ark. 600, 374 S.W. 2d 809 (1964). For an exhaustive treatise on the last subject see *Prentice* v. *City of Richmond*, 90 S.E. 2d 839 (Va. 1956).

Item III concerns a claimed exemption from the use tax and is based on a part of Acts 1961, Act 140 (which is no longer the law and is not now incorporated in the annotated statutes.) See footnote to Ark. Stat. Ann. § 84-3106 (Supp. 1971): "Tangible personal property in the form of raw materials or component parts for further processing, manufacturing, or assembling when such goods, wares and merchandise goes into and becomes a recognizable, integral or component part of a manufactured or processed article or end-product for sale either within or without the State of Arkansas." The items listed for exemption by appellees are egg processing equipment, poultry processing plant equipment, poultry processing plant repairs and replacements, hatchery equipment, feeder lids, trays, pads and cases for baby chicks. For two reasons the claimed exemption is without merit. The claimed items do not become an integral part of the end product. Secondly, as we have heretofore stated, appellees are not manufacturers. For the last four months appellees claim exemption under Act 113 of 1967. What we have said with respect to the exemption claimed during the last four months under Item II applies here.

For the reasons stated we conclude that appellees' claims for exemptions are not authorized by law.

Reversed.

BYRD and HOLT, JJ., dissent.

FOGLEMAN and JONES, JJ., concur.

JOHN A. FOGLEMAN, Justice, concurring. I agree with the dissenting opinion to the extent that the exemption encompasses any materials which are (or were at the time of the passage of the act) materials commonly known and used as feed for poultry and used in growing or producing poultry. I cannot see that appellees met their burden of proving that the items assessed were exempt. Apparently appellant lumped them all under the heading "Medication placed in water." Appellees seem to list them as "Water feed additives." I cannot tell what particular items are included in either. I think that through the testimony of Tyson it was clearly shown that vitamins and antibiotics were, at the time of the passage of the act, commonly a part of the feedstuff for chickens and are now given to the chickens in appellees' operation by adding them to water instead of feed. Apparently a considerable amount of the materials involved is vitamins and antibiotics. But it appears that among materials involved are such as Funjol, a copper sulfate compound for prevention of myotic infections, and Piperazine, a worming compound. These are clearly medications which I understand from the testimony are frequently administered in the feed mix given chickens but may also be administered in water. Showing that a medication may be, or that it is frequently, administered in feed does not mean that it is or was commonly known and *used* as feed. Yet, I find no means of separating those items which are, or were, commonly known and used for feed and those which may be and are frequently administered in feed mix. The burden of making this showing was upon appellees.

J. FRED JONES, Justice, concurring. I concur in the conclusion reached by the majority in this case because I am unable, from the record before us, to separate the items that I would be willing to accept as "feedstuff" under the statute from the items I consider clearly medication. I would consider vitamins and minerals as "feedstuff" commonly known and used as feed, but I do not so consider worming compounds and medical preparations to guard against infection. We are concerned here with materials commonly known and used *as* feed and not materials commonly known and used *in* feed. I agree that the appellees failed to meet their burden of proving that the items assessed in this particular case were exempt.

CONLEY BYRD, Justice, dissenting. I disagree with the portion of the majority opinion that rewrites the definition of "feedstuffs." Not only does the majority opinion ignore the definition of "feedstuffs" but it relies as authority upon a Maine case, *Lipman Poultry Company* v. *Johnson,* 138 Atl. 2d 631 (Me. 1958), which did not involve a "feedstuff" exemption.

The statute here involved, Act 94 of 1955, provides:

"Section 1. All feedstuffs used in growing or producing livestock and/or poultry in this State shall be exempt from the provisions of Act 386, Ark. Acts of 1941, as amended by Act 15, Ark. Acts of 1949, known as the Arkansas Compensating Tax Act.

Section 2. The following words and phrases shall, except where the context clearly indicates a different meaning, have the following meanings:

(a) . . .

(d) Feedstuffs: The term "feedstuffs" is defined to mean all materials which are commonly known and used as feed for livestock and/or poultry including unmixed or unprocessed grains; unground hay; whole or ground straw, and hulls when not mixed with other materials."

It will be observed that the exemption is not to feed but to "feedstuffs". Furthermore, the exemption is not limited to "feedstuffs" used in growing livestock and/or poultry but by the very terms of Section 1 of the Act "feedstuffs" used in PRODUCING livestock and/or poultry are also exempted. Thus up to this point, I could not conceive of any fair minded reader construing the exemption as applying to nutrients only until I read the majority opinion.

Section 2 (d) of the act defines "feedstuffs" in terms of "ALL MATERIALS commonly known and used as feed for livestock and/or poultry." Webster's International Dictionary defines "MATERIAL" as "the substance or substances, or the parts, goods, stock or the like, of which anything is composed or may be made; as, raw *materials.*" The same dictionary, a 1935 edition, defines the noun "feed" as a "mixture or preparation for feeding livestock." Thus when the definitions are put together, we find the statutory definition of "feedstuffs" to mean ALL MATERIALS WHICH ARE COMMONLY KNOWN AND USED AS *a mixture or preparation for feeding livestock or poultry.*" Of course Section 1 makes it plain that all such materials are exempt if they are "used. . .in producing" livestock or poultry.

The Maine case of *Lipman Poultry Company* v. *Johnson, supra,* involved a totally different statute. The Maine Statute Chap. 17, § 10 (VII) provided:

"Sec. 10. No tax on sales, storage or use shall be collected upon or in connection with:

VII. Sales of seed, feed and fertilizer used in Agricultural production. . .[1]

Thus having shown that the drafters of the statute intended to exempt all feedstuff material used in the

[1]Item No. VII during the pendency of the Lipman case was amended to read: "Sales of seed, feed, hormones, fertilizer, pesticides, insecticides, fungicides, weed killers, defoliants, litter and medicines used in agricultural production... ."

production of livestock and poultry, the only issue is whether such products are commonly known and used as such. Here again the majority ignore the record.

Dr. Robert W. Keirs, an Iowa State College graduate of veterinary medicine, testified that he had been connected with the poultry industry since 1958. He was familiar with the practice of administering materials which might be classified as drugs or medications or growth stimulants to poultry in Northwest Arkansas. He was familiar with such trade names as Vitapol, Floxaid and Vitilizer. These are trade names for mixtures of antibiotics and vitamins. Their use is primarily with starting poultry in the first few days of life and are administered at other times during the period of production. "Birds don't have to be sick or have anything wrong with them for these materials to be administered. The purpose of administering them is to better the conversion of feed protein and make the birds grow faster." The materials can be administered in solid feed mix and are frequently fed that way in the industry. There is no appreciable difference in purpose or results when the materials are fed to the birds in water as compared to solid feed. The basic and primary purpose of feeding antibiotics at low levels is to promote growth and feed efficiency.

Dr. David B. Fields, a veterinarian at Springdale, Arkansas, testified that he was at one time a director of the State Diagnostic Laboratory and that in his capacity as director of that State institution he had become aware of the practice of the poultry industry and how they feed chickens. He agreed with Dr. Keirs that mycin drugs and the vitamin compounds are used to increase feed efficiency either by growth or disease control. Such items are fed both in water and in feed.

Dr. P. W. Waldrup, associate professor of poultry nutrition at the University of Arkansas, had published several reports on some of the mycins. He agreed with Dr. Keirs that the primary function of the vitamins and antibiotics involved was to increase the growth rate or feed conversion of poultry. He pointed out that the

antibiotics and vitamins had been cleared by the F.D.A. for use in feed. According to him a typical broiler diet would, in addition to grain, soybean meal and poultry byproducts, include such things as limestone, phosphate source, salt and a vitamin mixture.

Don Tyson graduated from the University of Arkansas in 1951, having taken all of the available animal and poultry nutrition courses that were offered. He has worked for Tyson's since his graduation. He stated without equivocation that in such capacity he was in a position to know what ingredients were commonly sold and administered as feedstuffs in the State of Arkansas at the time Act 94 of 1955 became effective (Tyson produces over 300,000 tons of feed per year). He states that when "feedstuffs" were exempted, vitamins and antibiotics were commonly known and used for feed for poultry.

Added to the foregoing testimony is the fact that appellant and his predecessors recognized the vitamins and antibiotics to constitute "feedstuffs" until the present suit was filed.

Thus we have the testimony of experts in poultry and poultry nutrition, all of whom recognize that vitamins and antibiotics are materials commonly known and used in the growth and production of poultry. In addition, appellant and his predecessors recognized the materials as Exempt. Under these circumstances I'm at a loss to understand the majority's doubt that vitamins and antibiotics were "commonly known and used" in poultry feed. I, myself, find that all of the materials here involved are commonly displayed in the ordinary farm supply and feed store for purchase by any citizen without the necessity of a prescription or question as to the use thereof, and in containers giving directions for feeding to livestock or poultry. Added to the above is the recitation of the use of the antibiotics in the Lipman case, and the recognition given to the problem by the Maine Legislature in amending the Maine statute.

For the reasons stated I would affirm as to the vitamins and antibiotics.

HOLT, J., joins in this dissent.