ARKANSAS BEVERAGE COMPANY *v.* Richard
R. HEATH, DIRECTOR DEPARTMENT OF
FINANCE AND ADMINISTRATION,
STATE OF ARKANSAS

74-154                                      521 S.W. 2d 835

Opinion delivered April 14, 1975
[Rehearing denied May 19, 1975.]

*Rose, Nash, Williamson, Carroll* and *Clay, P.A.,* for appellant.

*Karl Glass, Harlin R. Hodnett* and *Robert Brockman,* for appellee.

JOHN A. FOGLEMAN, Justice. Arkansas Beverage Company brings this appeal from an adverse decree in its suit against appellee to recover a use tax deficiency assessment paid by it under protest. Appellant is engaged in the business of producing, selling and distributing bottled soft drinks called Pepsi Cola. The items purchased by it upon which the use tax was assessed were bottles, cardboard bottle cartons, an electronic bottle conveyor and a case conveyor. It is appellant's contention that the glass bottles, which were returnable and reusable, and the cardboard cartons in which bottled drinks were placed and carried became recognizable,

integral parts of the finished product, i.e., the bottled drink, and were thus exempt from use tax under Ark. Stat. Ann §§ 84-3106 (B) (Supp. 1973) and 84-1904 (i) (Repl. 1960) as items purchased for resale. Appellant also contends that the electronic bottle inspector, the bottle conveyor and the case conveyor were items of machinery purchased to replace, in its entirety, similar existing ma hinery used directly in produc-ing and packaging articles of commerce at appellant's manufacturing and processing plant in Arkansas and that the machinery replaced would have been exempt under Ark. Stat. Ann. § 84-3106 (D) (2) (a) (Supp. 1973), if that subsec-tion had been in effect at the time of its purchase, and was ex-empt under Ark. Stat. Ann. § 84-3106 (D) (2) (Supp. 1973).

The chancery court held the returnable bottles and paper cartons were purchased for appellant's use and con-sumption and were subject to tax, but that appellant was not a manufacturer within the meaning of Ark. Stat. Ann. § 84-3106 (D) (2). It also held the bottle inspector, bottle conveyor and case conveyor were not used directly in a manufacturing process and were subject to the use tax.

Let it be remembered that taxation is the rule and ex-emption the exception, so the heavy burden of clearly es-tablishing the claimed exemptions beyond reasonable doubt rested upon appellant. *Heath* v. *Midco Equipment Co.*, 256 Ark. 14, 505 S.W. 2d 739 (1974); *Scurlock* v. *Henderson*, 223 Ark. 727, 268 S.W. 2d 619. Tax exemption provisions must be strictly construed against exemption and to doubt is to deny the exemption. *Heath* v. *Midco Equipment Co.*, supra; *Hervey* v. *Tyson's Foods*, 252 Ark. 703, 480 S.W. 2d 592. It must also be remembered that appellate review in this case is by trial de novo upon the record, but that the chancery court's findings of fact will not be reversed unless clearly against the preponderance of the evidence.

Appellant lists the following points upon which it relies:

### A

### RETURNABLE BOTTLES AND CARDBOARD CARTONS ARE EXEMPT FROM USE TAX AS

PURCHASES FOR RESALE UNDER §§ 3106 (B) and 84-1904(i)

1. Returnable bottles and cardboard cartons are a recognizable, integral part of the finished product.

2. There is a sale of the bottles and cartons within the meaning of the Gross Receipts Act.

3. The cost of the bottles and cartons is included in the sales price of the product. The deposit is not the sale price of the bottle.

4. Prior to 1973 appellee recognized that returnable bottles and cardboard cartons were exempt from sales and use tax.

5. Other jurisdictions support appellant's position.

## B

THE ELECTRONIC BOTTLE INSPECTOR, CASE CONVEYOR AND BOTTLE CONVEYOR ARE EXEMPT FROM USE TAX UNDER § 84-3106 (D) (2) (SUPP. 1973).

1. Appellant's plant is a manufacturing or processing plant within the meaning of § 84-3106 (D) (2)

2. The machinery in question is used directly in producing, assembling, processing or packaging the bottled beverage.

3. The items in question were purchased to replace existing machinery in its entirety.

The chancellor held that appellant had failed to meet its burden of proof as to the bottles and cardboard cartons. We agree as to the bottles but not as to the cardboard cartons. We should say at the outset that as to the bottles, we consider the case of *Hervey* v. *Southern Wooden Box, Inc.*, 253 Ark. 290, 486 S.W. 2d 65 to be controlling in spite of the fact that there

had been an administrative determination that the bottles were exempt.

The bottles were returnable. The beverage sold by appellant is bottled under carbonation, sealed with a crown, and sold, insofar as is pertinent here, to retailers who sell food and beverages for consumption and who collect and remit a sales tax. These bottles containing the carbonated drink are delivered to appellant's customers in cases containing 24 bottles each in 24 separate compartments or pockets or with partitions containing cardboard cartons into which either 6 or 8 bottles of the beverage have been packed. Two-thirds of appellant's bottled drinks are packaged in the cardboard cartons, and appellant's customers nearly always sell a full package to the ultimate consumer, who takes the package from the seller's place of business to the place of consumption in the carton. The retailer, appellant's customer, puts up a deposit of $1.00 for each case of the bottled beverage. Seventy-two cents, or three cents per bottle, is for the bottles and twenty-eight cents for the wooden shell or case. No deposit is made on the paper cartons. The price of the drink is the same per bottle, regardless of whether it is packaged in a cardboard carton. The retailer requires the same deposit of his customer in order to encourage the return of the bottles. Whenever a new supply of beverages is delivered by appellant to a customer by truck, the driver picks up whatever empty bottles, cardboard cartons and wooden cases the customer has on hand and the retailer is credited with the amount he was charged as a deposit on such bottles and cases. The net charge for the bottles and cases delivered after deducting any such refunds is credited to appellant's "deposit income account." Appellant says that its customers are not accountable to it for either the bottles or the cartons and cannot be forced to redeem their deposits. Appellant charges the cost of new bottles and cartons as a part of the cost of sales at the time they are filled and packaged. The amount of any deposit charged or received is credited to the "deposit income account" from which is subtracted the amount of any refunds at the end of the fiscal year, the net credit balance in the "deposit income account" is then deducted from cost of sales, and appellant's income, as shown by its books, is increased by that amount.

So far as appellant's books are concerned the bottles and cartons are treated as a part of the cost of goods sold and not as overhead. New bottles that have never been put in service are carried on the books at cost when inventory is taken and used bottles, either full or empty, are valued at the deposit value. The only cartons on the balance sheet are new, unused cartons on hand at the end of an accounting period. Bottles and cartons in the hands of retailers or consumers do not appear on appellant's books at all.

The reason given by appellant for requiring the deposit is to encourage the return of the bottles for reuse. By dividing the number of cases of returnable bottles delivered by the number not returned during a fiscal year, appellant calculated that during the tax year involved, it used a bottle an average of 10 times before it was lost or discarded. By dividing the net cost of bottles lost or discarded during that year by the number of cases of returnable bottles, appellant determined that its cost of bottles for each 24-bottle case was 17.2 cents. The actual average cost of new bottles bought during appellant's fiscal year 1972 was 9 cents. During the same fiscal year the average selling price was $1.92 per case, the average cost was $1.106, and the overhead cost $0.634, leaving a net income of $0.18 per case before taxes and $0.078 after taxes.

Overhead expenses in appellant's accounting system consist of depreciation, advertising, promotion, delivery truck expenses, and other general expenses not charged as direct cost of the product. The cost of bottles and cartons under this accounting method comprised about 20% of the total cost of goods sold. In the case of non-returnable bottles, appellant charges their entire cost to the sale, and the Department of Finance and Administration recognizes that disposable bottles and cans are exempt from use tax as an integral part of the finished product. The selling price of the product in a non-returnable container is higher than that in returnable bottles.

All the bottles bear the Pepsi Cola Company trademark. Appellant acquires bottles that come from other franchised Pepsi Cola dealers because it accepts any bottle bearing the

company trademark in giving refund credit. If a neighboring Pepsi Cola bottler increases its deposit refund it is necessary for appellant to also make an increase in order to insure return of bottles it had originally bought and distributed in its territory. Appellant, in the fiscal year 1973 had increased the bottle deposit to 5 cents for this reason. Using the formula previously applied, appellant calculated that it then used each bottle 12 times.

The bottle deposit is not treated as a part of the sales price of the product under regulations issued pursuant to the Wage and Price Stabilization Act, under which the selling price of the bottled drink was regulated. No sales tax is paid by appellant when its customer returns bottles for deposit refund. The trademark of the Pepsi Cola Company on the bottle serves to identify the product for the consumer. Appellant distinguishes its bottled product from those dispensed at a soda fountain or from a vending machine in a paper cup, because those so dispensed must be consumed immediately and usually on the premises where purchased, while the bottled drink, being carbonated and sealed under pressure in a strong container, may be transported and stored for later consumption.

Upon these facts, appellant contends that the returnable bottles become a recognizable, integral part of its product — a packaged, bottled beverage — exempt as goods used in the manufacture, compounding, processing, assembling or preparing it for sale. Thus, says appellant, under our statutes, the bottles were purchased for resale. Appellant admits that the Arkansas case nearest in point is *Hervey* v. *Southern Wooden Box*, 253 Ark. 290, 486 S.W. 2d 65, wherein we held that there was no exemption for wooden cases in which the beverages sold by soft drink bottlers were delivered to the retailer, but that paper cups used in vending machines, from which the bottler sold its products at retail, were exempt. Appellant says that the crucial test is whether the bottle becomes a recognizable integral part of the product sold by it.

Appellant likens the bottles in this case to the paper boxes in *McCarroll* v. *Scott Paper Box Company*, 195 Ark. 1105, 115

S.W. 2d 839, and to the paper cups in *Hervey v. Southern Wooden Box Co.*, supra, saying that the product sold is a bottled, carbonated beverage which could not be preserved or sold if it were not contained in a bottle and that there is no real distinction to be made between a returnable and a nonreturnable bottle. Appellant reasons that it surrenders both title and possession when it delivers the bottled beverage. It considers the *Scott Paper Box* case controlling because the bottle is a component part of the product sold in unchanged form to the retailer and in turn to the consumer. Since the bulk syrup used at fountains is sold by it at a much lower price than the bottled drink, it takes the position that the cost of the bottles is an important element in the cost of the product and in computation of its selling price and is considered as such rather than as a part of general overhead expense, and the bottles are not used for any other purpose.

We do not agree, largely for the same reasons given for denying the application of the exemption statute to wooden soft drink cases. If appellant sells its bottled beverage at 8 cents per bottle, its cost analysis reveals that only $0.0075 is left for profit and payment of taxes. We cannot accept the premise that appellant is selling a 9 cent bottle for a 3 cent or even 5 cent deposit. The deposit, admittedly, is to "encourage" the return of the bottle and if appellant's calculations are correct, it rather effectively does so. For this or other reasons, bottles are returned and used over and over. Appellant's electronic bottle inspector is used to detect cracks in bottles to be used for bottling and to cause them to be discarded. Appellant's internal bookkeeping, by which it shows a profit on a "sale" of 24 bottled drinks for $1.92 when the bottles alone, if new, had cost $2.16, does not afford any basis for distinction of the *Southern Wooden Box Company* principle, even if the method is used throughout the bottling industry. Obviously, regardless of the "surrender" of title and possession, appellant expects to get its bottles back and if the deposit is not sufficient to assure that it does, it is raised. Otherwise, appellant could not long remain in business.

We regard substance to be more important than form in determining the nature of the transaction. In substance, the transactions involving the bottles when delivered to

appellant's customers, when "sold" by them and when returned to appellant are not sales, and the purchase of the bottles by appellant is not for resale but for use. In this respect, we agree with the Court of Appeals for the District of Columbia, 214 F. 2d 197 (1954). See also, *Gay* v. *Canada Dry Bottling Co. of Florida*, 59 So. 2d 788 (Fla. 1952); *Wichita Coca Cola Bottling Co.* v. *U.S.*, 152 F. 2d 6 (5th Cir. 1945); *Evans* v. *Memphis Dairy Exchange*, 194 Tenn. 317, 250 S.W. 2d 547 (1952). We find that the bottles are used by appellant and that there was no sale or purchase of them for resale. Appellant's bookkeeping is, as appellee suggests, more consistent with an amortization of the cost of the bottle than with a purchase for resale. The fact that in some cases retailers charge a "sales tax" on the consumer's bottle deposit, cannot transform the character of the bottler's transactions. Although the administrative interpretation of the statutes by appellant's predecessors may be considered as persuasive, we are not controlled by it and disagree with it. Certainly, we cannot say that appellant has, beyond reasonable doubt, established its entitlement to this exemption.

We reach a different result as to the cardboard cartons, which also bear the trademark of Pepsi Cola. Although it is true that a substantial number of them are returned and reused, it seems to us that this is largely attributable to fortuitous circumstances, among which is the convenience of using them for returning empty bottles. Appellant does nothing to assure their return. No deposit has ever been required. No credit is given to the retailer for return of the cartons. These cartons are delivered to retailers, primarily grocery stores, in non-compartmentalized wooden cases. The retailer almost always sells the filled carton to the consumer as a package just as he receives it. One purpose of the use of the carton is to encourage the purchase of more than one bottle of appellant's beverage. Another is for convenience of the customer in carrying and handling. Appellant's cost accounting on the cartons is handled in a manner similar to the treatment given bottles, except, of course, for the "deposit income." Appellant calculates that enough usable cartons are returned to enable the six-bottle cartons to be used two or three times and the eight-bottle ones, 3.6 times or an overall average of 2.8 times per carton. On this basis, appellant calculated that its cost,

per carton, was 4.7 cents, which is included as a cost item. Until returned cartons are put into the production line, appellant does not know whether they can be reused and does then discard damaged cartons. Because of this, and because their value is so small, used cartons are not considered for inventory purposes. Under these circumstances, we find that appellant's cartons are more analagous to the paper boxes in the *Scott Paper Box* case and the paper cups in the *Southern Wooden Box* case than to the wooden cases in the latter case or to the wrapping paper, paper bags and twine in *Wiseman* v. *Wholesale Grocers Association*, 192 Ark. 313, 90 S.W. 2d 987.

## B 1

We cannot agree with the chancellor that the appellant is not a manufacturer within the meaning of Ark. Stat. Ann. § 84-3106 (D) (2). The bottled soft drink is a distinctly different product from the mixture of syrup and carbonated water distributed at a fountain or by a vending machine. Even though appellant produces and sells Fountain syrup in bulk and buys and sells canned beverages, its principal business is the production and sale of bottled carbonated soft drinks, nearly all of which are sold to retailers for resale to the ultimate consumer. Appellant makes its own syrup. The bottled beverage is produced on a rather sophisticated production line, beginning with a case unloader, where empty bottles are removed from the cases and fed into the line, and ending with the "palletizing" of cases fitted with the bottled product and ready for market. During the process, the bottles are washed, inspected, filled, capped and repackaged into cases.

The syrup used by fountains and in vending machines serving the beverage in a paper cup is not the same as the concentrate purchased by appellant. The syrup sold to fountains is made by appellant who also makes it for its finished bottled product. In the preparation of the liquid beverage, water from the city supply is pumped into a reaction tank, where chlorine, lime and ferrous sulphate are added to reduce hardness and alkalinity, to oxidize such organic matter as bacteria and micro-organisms and to remove all insoluble material. The amounts of the chemicals vary from day to day after testing of the city water. The treated water is then pass-

ed through filters first of white, high silicate sand, then of carbon, and finally, of fine fiberglass. That water is added in proper proportions to granulated sugar in a stainless steel mixing tank to form a simple syrup to which is added, in precise order, a liquid concentrate purchased from the franchiser, vanilla, a citric acid solution, and, if necessary, a solution of benzoate of soda. The resulting mixture is "bottling syrup" if, after having been thoroughly stirred and left sitting for a certain period, and tested, it falls within accepted tolerances. Some syrups then require "aging" for a proper blending. After all tests are satisfactorily passed, the syrup passes into a tri-o-matic cooler where the syrup and water are mixed in exact proportions, cooled to 34°, and carbonated by being pumped through a spray head into a mist which is saturated with carbon dioxide gas. The finished beverage is then ready for the filling and crowning of bottles. This liquid goes into a uniblend filler, which by means of a counter-balance pressure system maintains a proper amount of the liquid in the filler tank where it, by a filling operation, is fed into the bottles, which have been through a cleaning and inspection process. Then the filled bottle is crowned and transferred to a belt for completion of the packaging and stacking process, after which it is moved to the stock warehouse or a delivery truck. The only item furnished by the Pepsi Cola Company is the concentrate.

The bottling operation is considered to be manufacturing in the bottling industry. "Rules and Regulations Pertaining to Bottling Plants" promulgated by authority of Ark. Stat. Ann. § 82-110 (Repl. 1960) require a properly screened syrup room for the mixing and handling of syrups and other ingredients whenever they are mixed for *manufacture* of beverages. They also require all products used in *manufacture,* such as extracts, flavors, sugar, syrup, color, water and the like be pure and wholesome.

For the purpose of the sections of the statute in question here, manufacturing and processing refer to and include those operations commonly understood to be within their ordinary meaning. It is the position of appellee that appellant has failed to meet its burden of proof and that it has only shown that it is engaged in a process of pouring Pepsi Cola

syrup and carbonated water into a cleaned and inspected bottle on which it then puts an air tight cap. Appellee relies principally upon *C.J.C. Corp.* v. *Cheney,* 239 Ark. 541, 390 S.W. 2d 437, where we held that the "ready-mix" concrete business was not manufacturing, because it involved only the mixing of various basic ingredients or material to prepare a concrete product for ultimate use.

We think, however, that the proof clearly shows that appellant is engaged in manufacturing at a manufacturing plant or facility. A particular flaw in appellee's reasoning arises from the premise that the process is pouring Pepsi Cola syrup into a bottle. He does, however, recognize that the syrup poured into the bottle is a manufactured article. It is clear from the undisputed testimony that this syrup is manufactured by appellant and the extensive process by which this is accomplished was described in detail. The courts follow the common usage or popular meaning of the word manufacturing in construing the statute. *Pellerin Laundry Mach Sales Co.* v. *Cheney,* 237 Ark. 59, 371 S.W. 2d 524; *C.J.C. Corporation v. Cheney,* 239 Ark. 541, 390 S.W. 2d 437. We think of a manufactured article as something to be placed on the market for retail to the general public in the usual course of business. *Morley* v. *E. E. Barber Construction Co.,* 220 Ark. 485, 248 S.W. 2d 689. The act itself recognizes that manufacturing encompasses the processing, fabricating or assembly of raw materials into a form of personal property to be sold in the commercial market. See, Ark. Stat. Ann. § 84-3106 (D) (2) (c). In a slightly different context we have approved a definition of a manufacturer as one engaged in making materials, raw or partly finished, into wares suitable for use. *Riggs* v. *Hot Springs,* 181 Ark. 377, 26 S.W. 2d 70.

We find that appellant is engaged in manufacturing a bottled carbonated beverage from raw ingredients such as water, sugar, Pepsi Cola concentrate, vanilla, citric acid and carbon dioxide and that the plant wherein the process is carried on is a manufacturing plant. This was the result reached in Oklahoma. *Oklahoma Tax Commission* v. *Oklahoma Coca Cola Bottling Company,* 494 P. 2d 312 (Okla., 1972). See also, *Assessors of Boston* v. *Commissioner of Corporations and Taxation,* 323 Mass. 730, 84 N.E. 2d 129 (1949). The fact that the

Pepsi Cola concentrate or other ingredients had been partly processed does not take the operation out of the field of manufacturing.

It is not so easy to deal with the question whether appellant met its burden of proving that the electronic bottle inspector, case conveyor and bottle conveyor are used directly in the actual manufacturing or processing operation at any time from the initial state where actual manufacturing or processing begins through the completion and packaging of the finished end product. There is no difficulty in fixing one terminal of this requirement. The "packaging" of the end product is accomplished when the bottled carbonated beverage is placed in the wooden cases. The great difficulty lies in ascertaining the initial stage where the actual processing begins. There seems little room for doubt that each piece of machinery or equipment involved here was used directly in producing, assembling, processing, finishing or packaging of an article of commerce.

The bottling process is conducted on a fully automated production line. The case unpacker lifts empty bottles from the wooden cases and places them upon a bottle conveyor upon which they are fed into a bottle washer. The case conveyor, a continuous belt, then takes the empty wooden cases from the case unpacker to the case packer at the other end of the production line where it is loaded with filled drink bottles. The empty bottles taken from the cases are conveyed through a thorough rinsing and washing, to an inspection station. There two persons check for chipped, cracked, uncleaned or beaded bottles, which are removed from the bottle conveyor. The bottles remaining on the conveyor then pass to the electronic bottle inspector, which projects a beam of light through the base of each bottle into a receiver. If the beam of light is reduced or deflected by any object or material in a bottle, that bottle is rejected; otherwise, it passes to the filler where it is filled with the finished beverage coming from the tri-o-matic cooler and then moved to the crowner or bottle capper where it is sealed and then it goes to the case packer where it is packed into a wooden case with 23 other such bottles. According to appellant's vice president and chief operations officer the manufacturing process begins, at the

latest, with the case unpacker, and each step in the process thereafter is just as important to the production of the final finished product as any other and without any of them the production line would not function.

The bottle conveyor in question extends from the bottle washer through the electronic inspector. The functions of the bottle conveyor and the bottle inspector are completed before the filling of the bottles. Neither of the three machines in question has anything to do with the liquid before it is put in the bottle. It seems clear to us that the electronic bottle inspector and the bottle conveyor are used directly in producing, assembling, processing or packaging of the article of commerce between the initial state of actual manufacturing or processing and the completion of the finished article. A majority of the court also feels that the case conveyor falls into this category.

We cannot agree with appellee that only that machinery used in the mixing or the filling process could possibly be considered as machinery or equipment used directly in manufacturing or processing. Neither do we agree with appellant that the bottle conveyor is excluded as transportation equipment not directly used in the manufacturing or processing operation. The majority of the court does not agree that the case conveyor is excluded transportation equipment. In this respect we are influenced by the fact the process is a continuous, synchronized operation from the time the empty bottle is taken from the case until the case filled with the bottled beverage is palletized for storage, or delivery, without any human intervention, except for the removal of broken bottles and the intermittent removal of filled bottles for testing the product, and, if any one machine or device in the production line fails to function, the operation stops. In such an integrated process, we must consider each such machine or device as being used directly in producing, assembling, processing and packaging the ultimate product. This was the approach we took in *Cheney* v. *Georgia-Pacific Paper Corp.*, 237 Ark. 161, 371 S.W. 2d 843; *Arkansas Rwy. Equipment Co.* v. *Heath*, 257 Ark. 651, 519 S.W. 2d 45 (1975). See also, *State* v. *Try-Me Bottling Co.*, 257 Ala. 128, 57 So. 2d 537 (1952); *Schenley Distillers* v. *Commonwealth*, 467 S.W. 2d 598 (Ky. 1971).

The decree is affirmed insofar as it affects the bottles, but reversed as to the cardboard cartons, the case conveyor, the bottle conveyor and the electronic bottle inspector.

The Chief Justice, MR. JUSTICE BYRD and Special Justice JOHN S. DAILY dissent from the affirmance but concur in the reversal. Mr. Justice HOLT was disqualified and did not participate.

JOHN S. DAILY, Special Justice, dissenting in part. The majority of the Court makes a distinction between the cardboard cartons and the bottles which I am unable to draw. Each is a "recognizable, integral part of the manufactured product" (a carton of bottled carbonated soft drinks) — Sec. 84-1904 (i) (Repl. 1960). This total end product is sold by the manufacturer to the retailer, and by the latter to the consumer, incident to which resale the retailer collects from the consumer a Gross Receipts Tax calculated upon the total resale price of the complete package. I see no practical way for the retailer to separate the price of the components of this end product and impose a Gross Receipts Tax upon part of same and exclude other parts. The majority imposes a Compensating Use Tax upon the bottles at their purchase by the manufacturer, but Section 84-3106 (B) exempts these bottles from the Use Tax if they are subjected to a levy of a Gross Receipts Tax. A levy of both taxes upon the same item of tangible personal property is precluded by the statutes and by all prior pronouncements of this Court on this point. *Hervey* v. *International Paper Company*, 252 Ark. 913 at 915; *Hervey* v. *Southern Wooden Box Company*, 253 Ark. 290 at 291. This distinction drawn by the majority between the bottles and the cardboard cartons seems to be predicated upon the practice of the Appellant, in company with a great number of its fellow manufacturers in the carbonated bottled drink trade, to require its purchaser, the retailer, (in addition to paying the purchase price) to put up a deposit on each bottle; and the retailer makes a like requirement of his purchaser, the consumer. Each of these deposits is fully refundable in the event that the bottle is returned by the consumer to the retailer, and by the retailer to the manufacturer. This practice, according to the record in this case, is not applied to cardboard cartons. I view this deposit and refund require-

ment as to the bottles to be wholly irrelevant to the question of the impact of the imposition and exemption provisions of the Gross Receipts and Compensating Use Tax Acts. To me it is clearly a device, and only that, to induce the consumer to return the bottle to a retailer and reclaim his deposit, and for the retailer to return it to the manufacturer and reclaim his deposit, to the end that the bottle may be recycled by the manufacturer. This practice would appear to be laudable and in the interest of conservation benefiting the general economy. Also, according to the uncontradicted evidence in the record, it results in a benefit to the consumer in enabling the manufacturer to make more frequent reuse of each bottle whereby it can profitably include in its sale price the amortized (in the practical sense) cost of the bottle over the bottle's returnable life, rather than the bottle's total initial cost being included in the sale price on each sale of the end product. Also, according to the uncontradicted evidence in this record, there is an absolute sale of the completed packaged product, and all of its components, by the manufacturer to the retailer, and by the retailer to the consumer, and each of these latter two is free to do as he will with the product, including the bottles, which he may return for recovery of his deposit or not, as he chooses.

If the manufacturer is subjected to a Compensating Use Tax on its cost of the bottles, which I understand the majority to hold, it will necessarily be under economic compulsion to add this additional tax cost to its end product price and thereby pass it on to the consumer. Contrary to the opposite politically inspired pronouncements, producers do not pay taxes. They collect and remit them and pass them on in the price of their products into the hands of the consumer. If they do not they are soon out of business. If this economic law of the free market system prevails, the manufacturer will add the use tax imposed on the bottles to the price of its packaged end product which includes the bottles, and the retailer will impose a Gross Receipts Tax calculated on his total price to the consumer (i.e. his purchase price from the manufacturer, including the use tax imposed on the bottles, plus his retailers profit). There is no suggestion in the record as to how the retailer could eliminate the bottles from the retail price in calculating the sales tax he must collect. Thus the consumer

will pay a Gross Receipts Tax upon the final retail price which will include the "passed on" use tax paid by the manufacturer. This results in the double tax, and even a tax on tax, that is proscribed by the Court's decisions in the cases cited above.

I respectfully dissent from the affirmance of the Trial Court's ruling on the bottles.

I am authorized to state that the Chief Justice and Mr. Justice Byrd join in this dissent.