Jim C. PLEDGER, Director of the Arkansas Dept. of Finance and Admin., and Timothy J. Leathers, Comm. of Revenues *v.* BALDOR INTERNATIONAL, INC., and Southwestern Die Casting, Co., Inc.

91-304                                    827 S.W.2d 646

Supreme Court of Arkansas
Opinion delivered March 30, 1992

*Beth B. Carson*, Revenue Legal Counsel, for appellants.

*Rose Law Firm, A Professional Association*, by: *Richard T. Donovan*, for appellees.

TOM GLAZE, Justice. This is a use tax case. The appellee, Baldor Electrical Company, manufactures industrial electric motors and grinders, and its corporate headquarters is in Fort Smith.[1] Appellee Southwestern Die Casting Company, a fully owned subsidiary of Baldor, manufactures rotor castings that are a component part of Baldor's electric motors. The Arkansas Department of Finance and Administration (DFA) assessed a use tax on appellees' purchases of advertising goods and equipment from out-of-state vendors during the period May, 1980 thru April, 1986. Specifically, the equipment included seven different testing machines and an environmental control system. The appellees paid the tax in protest and requested an administrative hearing. The Board of Hearings and Appeals sustained DFA's assessments.

Appellees then pursued their challenge in chancery court. The chancellor found that all of the appellees' advertising goods and equipment were exempt from the use tax assessments and ordered a refund to the appellees for the amount of taxes paid for these items. DFA appeals from that ruling. We reverse the

---

[1] Baldor International, Inc. is not a party to this appeal, because Baldor International did not appeal from the chancellor's upholding of its assessment for corporate income tax.

chancellor's finding of a use tax exemption for the advertising services and the environmental control system and affirm in part and reverse in part his findings that exempted all of appellees' testing machines.

■ Before beginning our discussion on the merits of the appellant's appeal, we recognize the following settled rules of construction used in tax exemption cases. A presumption exits in favor of the taxing power of the state, and a taxpayer has the burden of establishing the right to an exemption beyond a reasonable doubt. *Pledger* v. *Easco Hand Tools, Inc.*, 304 Ark. 47, 800 S.W.2d 690 (1990). Tax exemptions must be strictly construed against exemption, and to doubt is to deny the exemption. *Id.* In addition, this court has stated that tax exemption cases are reviewed *de novo* and the appellate court does not set aside the findings of the chancellor unless they are clearly erroneous. *Id.*

We first address the appellants' argument that the chancellor erred in finding that the appellees were entitled to a use tax exemption for advertising services. The appellees used Atkinson Group, a Missouri advertising agency, and argued that Atkinson's billings clearly distinguished between services and goods. The chancellor agreed with the appellees' argument that the advertising services were separable from the charges for advertising materials and therefore were exempt from the use tax.

A use tax at a rate of three per cent of the sales price is assessed for the privilege of storing, using or consuming within this state any article of tangible personal property purchased for storage, use or consumption in this state. Ark. Code Ann. § 26-53-106(a) (1987). Sales price is defined as the following in the Compensation or Use Taxes provisions:

> Sales price means the consideration paid or given, or contracted to be paid or given, by the purchaser to the vendor for the article of the tangible personal property *including any services that are a part of the sale valued in money*, whether paid in money or otherwise, and includes any amount for which credit is given to the purchaser by the vendor without any deduction therefrom on account of the cost of the property sold, the cost of materials used; labor or service cost, . . . (Emphasis Added).

Ark. Code Ann. § 26-53-102(1) (1987); Ark. Stat. Ann. § 84-3104(a) (Rep. 1980). The wording of this statutory provision, itself, makes it clear that services that are part of the sale are not to be excluded in the use tax assessment.

Further, the case of *Larey* v. *Dungan-Allen*, 244 Ark. 908, 428 S.W.2d 71 (1968), is instructive on this issue. In that case, this court refused to separate a photographer's services from the materials, holding that it is the exercise of the skill that makes the photograph saleable. The photographer charged a $25.00 hourly rate for his services, but the photographs were sold for $2.00 each. However, we concluded that the photograph should not be priced solely on the basis of its constituent materials, but that such things as invested capital, education or technical training, professional skill labor and overhead expenses can be expected to contribute to the value and selling price of the finished product.

While we note that the *Dungan-Allen* case involved a gross receipts tax, the same language forbidding the deduction for services from the sales price, as cited in the use tax provisions, is found in the definition of "gross proceeds," Ark. Code Ann. § 26-52-103 (1987). Thus, we find the rationale in *Dungan-Allen* applicable to the present case. Here, the professional skills and labor of the advertising agency are necessarily included in the costs of the final product or advertising materials. Therefore, we must reverse the chancellor's holding on this point.

Likewise, we find merit in the appellant's second argument that the chancellor erred in holding that the appellees were entitled to a use tax exemption for appellees' environmental control system. Mike Mann, the Executive Vice President of Baldor, testified that in 1980 Baldor modernized its facility by investing around $10,000,000 in sophisticated equipment like Computer Numeric Control lathes (CNC machines) that cut raw materials within very specific and minute tolerances. When Baldor first purchased the CNC machines, it had no environmental control system, and as a result the machines broke down frequently. After exploring other similarly priced alternatives, Baldor installed an environmental control system only in the manufacturing area of the plant. Although DFA admitted that Baldor's environmental control system was necessary for the effective operation of Baldor's CNC machines, DFA's auditor

denied the exemption because the system was not used directly in the manufacturing of Baldor's product — its electric motor.

Whether an environmental control system is entitled to a use tax exemption is a question of first impression for this court. Under statutory law, the following use tax exemption is recognized:

> Machinery and *equipment used directly in producing, manufacturing*, fabricating, assembling, processing, finishing, or packaging of *articles of commerce* and [at] manufacturing or processing plants or facilities in the State of Arkansas. . . .
>
> (a)  Such machinery and equipment will be exempt under this section if it is purchased and used to create new facilities within this state or to expand existing facilities within this state;
>
> (c)  It is the intent of this subsection to *exempt only such machinery and equipment as shall be utilized directly in the actual manufacturing or processing operation at any time from the initial state where actual manufacturing or processing begins through the completion of the finished article of commerce* and the packaging of the finished product. The term "directly" as used in this Act is to limit the exemption to only the machinery and equipment used in actual production during processing, fabricating or assembling raw materials or semifinished materials into form in which such personal property is to be sold in the commercial market. Hand tools, buildings, transportation equipment, office machines, and equipment, machinery and equipment used in administrative, accounting, sales or other such activities of the business involved and all other machinery and equipment not directly used in the manufacturing or processing operation are not included or classified as exempt. (Emphasis added).

Ark. Stat. Ann. § 34-3106(D)(2) (Repl. 1980).

In interpreting, "used directly in manufacturing", this court has not required the equipment to directly come into contact with the finished product before qualifying for an exemption. For instance, in *Cheney* v. *Georgia-Pacific Paper*

*Corporation*, 237 Ark. 161, 371 S.W.2d 842 (1963), this court allowed a use tax exemption for Georgia-Pacific's steam turbine generators finding that they performed a dual function — first, they utilized steam to generate electrical energy, and second, in so doing, they reduced the steam pressure and emitted it at certain levels to component parts of the paper manufacturing process where it was used for various purposes, such as cooking, drying and heating. The chancery court concluded that the steam turbine generator was a primary facility in the paper manufacturing process, and if the generator were removed, the manufacturing process would cease.

An environmental control system is clearly different from a steam turbine generator which generates electrical energy that activates the manufacturing process. The environmental control system directly affects the surroundings of the manufacturing area of Baldor's plant and thereby protects the efficiency and effectiveness of the CNR machines used to produce Baldor's electric motors. In terms of Arkansas law set out above concerning when equipment may be exempt, Baldor's environmental control system clearly is not "used directly in producing [or] manufacturing" Baldor's motors and neither can it be said the system is "utilized directly in the actual manufacturing or processing operation."

Cases from other jurisdictions support our conclusion. In *Indiana Dept. of State Revenue v. RCA Corporation*, 310 N.E.2d 96 (Ind. Ct. App. 1974), RCA was denied an exemption for an environmental control system even though the DFA auditor conceded that maintenance of rigidly controlled environment was an integral and essential part of the manufacturer's color picture tube manufacturing process. In refusing to give such a broad meaning to the words "directly used . . . in the direct production" as utilized in the Indiana exemption statute, the court stated the following:

> The very name of the equipment, whether "air conditioning" or "environmental control", signifies that its immediate effect is on the surroundings in which the manufacturing process takes place and only remotely, through the intervening agency of those surroundings, on the tubes or on the process by which they are manufactured.

The Georgia Appellate Court has also addressed this issue. In *Blackmon v. Screven County Industrial Dev. Authority*, 131 Ga. App. 265, 205 S.E.2d 497 (1974), a manufacturer of synthetic yarn sought a use tax exemption for climate control equipment arguing that the equipment prevented certain fibers from frizzing, curling, or becoming wet. The court stated that the test is not whether the property is essential to the operation of the plant, but whether it is an actual part of the process of manufacture. Under this test, the court found that the climate control equipment had nothing to do with the materials in manufacture, it operates solely on the air which then, as an intervening agency, circulates around the carpet yarn. *See also* Annotation, *Direct Use—Sales and Use Tax Exemption*, 3 A.L.R.4th 1129, § 3 (1981).

■ In the last point, the state argues that the chancellor erred in granting a tax exemption for seven pieces of testing equipment owned by appellees. In finding that the testing equipment should be exempt, the chancellor relied on the following language in Act 492 of 1985, codified as Ark. Code Ann. § 26-53-114(c)(3)(B) (1987):

> Further, machinery and equipment "used directly" in the manufacturing process shall include, but shall not be limited to, the following: . . .
>
> (ii) Testing equipment to measure the quality of the finished product.

While Act 492 was not in effect at the time of the state's assessment, the Act's preamble states that its purpose is "to clarify the types of property subject to the gross receipts tax and the compensating (use) tax." Thus, the General Assembly, in enacting the 1985 Act, did not change the prior law but merely intended to clarify it. Accordingly, we agree with the chancellor that this subsequent Act can be considered in deciding this issue. *Cf. Nathaniel v. Forrest City School Dist. No. 7*, 300 Ark. 513, 780 S.W.2d 539 (1989).

We do not agree with the chancellor that all of the appellees' testing equipment fits under this "testing equipment" exemption. Three of the appellant's testing machines are located in Fort Smith at a separate facility, Valmont Industries, a manufacturer

of irrigation systems. Baldor's Vice President, Mr. Mann, testified that in order to obtain business from Valmont, Baldor agreed to purchase equipment for a plant it was going to construct in Fort Smith, and in return, Valmont agreed to purchase a set number of Baldor motors. The Brinell Tester and the Micromet Tester test the hardness of the cast iron end plates that are parts of the motor. These tests are necessary to insure that the end plates will not crack while the motor is operating. Because the test is destructive to the product tested, it is done on a random basis on the incoming shipments of end plates before they are sent to the production floor. The other piece of testing equipment located at Valmont is the Electric Gear Checker, which is used to test how much time will lapse at a certain stop before the gears in the motor will backlash.

■ While the appellees argue that Baldor has an integrated manufacturing process that continuously flows through the production cycle, they failed to produce evidence to show that these three pieces of testing equipment located at an unrelated facility were part of Baldor's integrated manufacturing process or were used directly in Baldor's manufacturing process. Even if we were to assume that the testing equipment was used to test Baldor motors used at the Valmont plant, the Brinell Tester and the Micromet Tester are used to test the end plates before they are sent to the production floor, and there is no evidence before us to show that the Baldor motors are being manufactured at Valmont. As stated earlier, tax exemptions must be strictly construed against exemption, and to doubt is to deny the exemption. *Easco Hand Tools, Inc.*, 304 Ark. 47, 800 S.W.2d 690. In sum, from our review of the evidence presented on these three machines, we must hold that the chancellor's finding of exemptions for the three pieces of testing equipment located at Valmont Industries was clearly erroneous.[2]

---

[2] While the appellees contend that this issue was not raised below, the location of these three pieces of equipment and how they fit into their integrated plant theory was an essential part of the appellees' burden of proving their entitlement to a tax exemption. The fact that these pieces of equipment were located in another facility was brought to the chancellor's attention through the direct testimony and cross-examination of appellee's witness, Mr. Mann. This evidence, together with the auditor's general statement that the pieces of equipment did not qualify for an exemption because they did work directly on the product, was sufficient to apprise the chancellor of this issue and to permit the state to

The other four pieces of testing equipment are used at various stages of Baldor's manufacturing process. The Automatic Windability Tester stretches copper wire to determine at what point it will break. Copper wire is a component part of the Baldor electric motor. This test is also a destructive test, so it is randomly conducted on the wire when it is received in the raw material receiving warehouse. The I.D.-O.D. Comparator System measures the master gauges to determine that specific tolerances are being held in the manufacturing of the motors. At the Baldor's subsidiary, Southwestern Die Cast, the Injection Performance Analyzer is used to determine at what force the die cast machine must shoot aluminum into the holes of the end plates to hold the rotor core together. The rotor must be balanced, or the motor will be defective. And the last piece of testing equipment is the High Power AC Motor Test Panel, and it is used on the finished motor to put stress on the motor to test its performance. This machine uses high voltage electricity to test motors for amps, voltage and various other electrical needs. Again, because this is a destructive test, it, too, is used on a random basis.

■ From our review of the evidence in the record, we cannot say that the chancellor's finding that the above four pieces of testing equipment were used directly in Baldor's integrated manufacturing process is clearly erroneous. Three of the pieces of equipment discussed above test component parts of the motor, and the High Power AC Motor Test Panel tests the finished motor. These tests were essential to insure the quality of Baldor's electrical motors in their finished state. As stated earlier, we find the clarification contained in Act 492 of 1985 to include testing equipment to measure the finished quality of the finished product illustrative on this issue. Further, in *Arkansas Beverage Co.* v. *Heath*, 257 Ark. 991, 521 S.W.2d 835 (1975), we granted a use tax exemption of a beverage bottle inspector, which inspected the bottle before the drink liquid was added. Thus, we have previously recognized an exemption for components of a finished product, since the soft drink bottle is a component part of the finished product, the soft drink.

---

argue it in this *de novo* review.

For the reasons stated above, we affirm in part and reverse in part.

CORBIN, J., dissents in part.

DONALD L. CORBIN, Justice, dissenting in part. I must respectfully dissent. I would affirm the trial court's determination that the environmental control system is entitled to a use tax exemption. The sophistication of appellees' equipment necessitates a controlled environment so as to maintain the computer generated production line. If a computer gets too warm it will not function; and therefore, there would be no production while the production line is down. I fail to see how this system is not directly involved in the manufacturing process.