Karen R. Baker, Justice, dissenting.' Because I would affirm the circuit court, I must dissent. The majority summarily reverses the circuit court with little analysis and ignores our precedent set in Arkansas Beverage Company v. Heath, 257 Ark. 991, 521 S.W.2d 835 (1975). The question here is whether the treatment process of converting raw surface water into potable drinking water through the complex process used by Carrothers, including injecting chemicals into the water, constitutes manufacturing. The answer is yes. In determining whether manufacturing has occurred, in Ragland v. Arkansas Valley Coal Servs., Inc., 275 Ark. 108, 109-10, 627 S.W.2d 559, 560 (1982), which the majority relies on, we cited to the United States Supreme Cóurt’s holding: As the United States Supreme Court confirmed in East Texas Motor Freight Lines, Inc. v. Frozen Foods [Food] Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917 (1955) [ (1956) ]: Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, ... There must be a transformation; a new and different article must emerge, having a distinctive name, character or use. In Arkansas Beverage-Company we addressed a situation analogous to the one in this case and held that Arkansas Beverage Company, which bottled Pepsi Cola, was a manufacturer and was therefore entitled to a manufacturing exemption for cardboard cartons. In holding that j inthe soft drinks produced were manufactured for purposes of the exemption - statute, we explained, In the preparation of the liquid beverage, water from the city supply is pumped into a reaction tank, where chlorine, lime and ferrous sulphate are added to reduce hardness and alkalinity, to oxidize such organic matter as bacteria and micro-organisms and to remove all insoluble material. The amounts of the chemicals vary from day to day after testing of the city water. The treated water is then passed through filters first of white, high silicate sand, then of carbon, and finally, of fine fiberglass. That water is added in proper proportions to granulated sugar in a stainless steel mixing tank to form a simple syrup to which is added, in precise order, a liquid concentrate purchased from the franchiser, vanilla, a citric acid solution, and, if necessary, -a solution of benzoate of soda. The resulting mixture is “bottling syrup”, if, afteiv having been thoroughly stirred and left sitting for. a certain period, and tested, it falls within accepted tolerances. Some syrups then require “aging” for a proper blending. After all tests are satisfactorily passed, the syrup passes into a tri-o-matic cooler where the syrup and water are mixed in exact proportions, cooled to 34, and carbonated by being pumped through a spray head into a mist which is saturated with carbon dioxide gas. The finished beverage is then ready for the filling and crowning of bottles. This . liquid goes into a uniblend filler, which by means of a counter-balance pressure system maintains a proper, amount of the liquid in, the filler tank where it, by a filling operation, is fed into the bottles, which have been through a cleaning and inspection process. Then the filled bottle is crowned and transferred to a belt for completion of the packaging and stacking process, after which it is moved to the stock warehouse or a delivery truck. The only item furnished by the Pepsi Cola Company is the concentrate. [[Image here]] We find that appellant is engaged in manufacturing a bottled carbonated beverage from raw ingredients such as water, sugar, Pepsi Cola concentrate, vanilla, citric acid and carbon dioxide and that the plant wherein the process is carried on is a manufacturing plant. 257 Ark. at 1001-03, 521 S.W.2d at 841-42. Here, like Arkansas Beverage, a complex process[2] also occurs. Further, a new and Indifferent article has emerged, having a distinctive name, character or use: consumable drinking water. However, despite Arkansas Beverage being on point, the majority distinguishes our holding in that case in one sentence: Unlike the present case, the manufacture of the Pepsi product in Arkansas Beverage implied a transformation of raw materials into a new product. This summary distinction is misplaced. Rather, like Arkansas Beverage, here, there is a transformation of non-consumable water into consumable water through a three-phase complex mechanical and chemical water-treatment process wherein fluoride and other |12chemicals are injected into the water. This process constitutes manufacturing, which exempts Carrothers from the sales-and-use tax. Further, although not binding precedent, Department of Revenue ex rel. Luckett v. Allied Drum Service, Inc., 561 S.W.2d 323 (Ky.1978), supports my interpretation. In Allied Drum, the Kentucky Supreme Court considered whether machinery used to process metal drums Was machinery used in manufacturing and therefore exempt from the sales-and-use tax. The Department of Revenue argued that the process did not constitute manu-. factoring because it did not. produce a new article, but began with a used drum and ended with a used drum. Id. at 324. The Kentucky Supreme Court then examined previous decisions, including Prestonsburg Water Company v. Prestonsburg Board of Supervisors, 279 Ky. 551, 131 S.W.2d 451 (1939). In Prestonsburg, the Kentucky court rejected the argument that a water filtration system was machinery used for manufacturing and thus held that it was not exempt from taxation, In so holding, the court explained that “[i]t creates no new product but is still water.” The Allied Drum court overruled Prestonsburg and reasoned that the end product was something new, “water fit for use.” 561 S.W.2d at 326. Here, the extensive three-phase treatment process clearly constitutes manufacturing because .it .also involves the injection of numerous,chemicals, including fluoride, at each of the three stages. Because the process is “manufacturing” as contemplated by the manufacturer’s exemption, Car-rothers should be exempt from the sales- and-use tax. The purpose of this exemption is to “encourage the location of new manufacturing plants in Arkansas, the expansion of existing manufacturing plants in Arkansas, and the modernization of existing | ^manufacturing plants in Arkansas through the replacement of old, inefficient, or technologically obsolete machinery and equipment.” Ark.Code Ann. § 26-52-402(a)(2)(C). Carrothers’s manufacturing of potable water has supported the statute’s mission, yet the majority has ignored this.- Finally,- although the majority holds that — “[i]t was water in the beginning, and it was water in the end. Carrothers acquired materials and constructed a.facility to treat and clean the water, but it did not manufacture the water” — this holding ignores the details and. complexity of the facts in this case. Accordingly, based on my discussion above, I would affirm the circuit court. Goodson, J., joins. . The majority has accurately described the complex process as follows: The first phase of the water-treatment process begins with the raw surface water’s pretreatment process known as "trash or debris removal.” According , to Morrand, the raw surface water is directed by gravity flow or pumped through intake structures where large items, such as logs, branches, leaves, and trash, are screened and removed. Morrand stated that a "number of chemicals are injected into the ‘raw surface water’ at this point for the purpose of removing contaminants that would affect the taste and odor of the final drinking water (‘potable’) product.” Morrand explained that Carrothers constructed a chemical holding facility, with numerous tanks and piping, to facilitate this process. During the second phase, known as the flocculation process, the water from the 'first phase is subjected io several additional chemical applications "designed to settle out microscopic particles and to clarify the partially treated 'raw surface water.’ ” Morrand stated that coagulant chemicals are injected at a "Rapid Mix Facility” and a second "SuperPulsator Clarifier,” installed by Carrothers: during the expansion, that removes “color, turbidity, and organic materials from the chemically treated ‘raw sur,face water.’" Lastly, Morrand stated that during the final water-treatment phase, the water is purified by exposing the water to chemicals, typically chlorine, lime, and fluoride, before it passes from a "Backwash Tank” into the "Final Filter Tanks." Morrand concluded that "many of [Carrothers’s] purchases of items of tangible personal property (e.g., all of the piping used to carry the influent and the processing chemicals within this drinking water treatment plant, as well as the concrete for the holding tanks, etc.)” were exempt from Arkansas state and local sales-and-use taxes.