William D. GADDY, Director of
Revenues *v.* HUMMELSTEIN IRON &
METAL, INC.

78-333                                    585 S.W. 2d 1

Opinion delivered June 18, 1979
(In Banc)
[Rehearing denied September 4, 1979.]

*Robert G. Brockmann, Jack East, III, Joseph V. Svoboda, H. Thomas Clark, Timothy J. Leathers,* and *Barry E. Coplin,* for appellant.

*McMath, Leatherman & Woods;* and *Barrett, Wheatley, Smith & Deacon,* for appellee.

GEORGE ROSE SMITH, Justice. Our compensating (or use) tax law contains an exemption for machinery that is directly used in manufacturing. Ark. Stat. Ann. § 84-3106 (D) (2) (Supp. 1977). The appellee Hummelstein buys and sells scrap metal. The state revenue department ruled that Hummelstein's machinery is subject to the tax, for the reason that Hummelstein is not engaged in manufacturing. The appellee paid the tax under protest and brought this suit for recovery. This appeal is from a decree holding that Hummelstein is a manufacturer and is therefore entitled to claim the exemption.

The appellee buys scrap metal in many forms, but in the testimony the clearest description of its operation relates to its handling of old cars, which it buys in great numbers. After the non-metallic materials, such as rubber and upholstery, have been removed from an old car, the engine block (for which there is a separate market) is pulled out. The remaining metal parts are then separated according to their nature, such as steel, iron, aluminum, brass, and copper. Dirt and other foreign matter must be removed. Large parts of a car, such as its steel body, are cut into pieces small enough to be separated by hand according to the grade of the particular metal. (Number two heavy melting steel is mentioned in the testimony as one grade.) The various metals and grades are then compressed into cubes or bales that may weigh as much as eight or nine hundred pounds. Steel, for example, is compressed into cubes small enough to go into the furnace doors at steel mills, where the scrap metal is to be made into new steel products. The bales or cubes of scrap metal are what the appellee sells to its customers.

Under the statute and our earlier cases the appellee cannot be classified as a manufacturer. The statute refers both to "manufacturing" and "processing," § 84-3106 (D) (2) (e), but it is settled that "manufacturing and processing are not two distinct operations and that a taxpayer, in order to be entitled to the exemption, must first qualify as a manufacturer." *Heath* v. *Westark Poultry Processing Corp.*, 259 Ark. 141, 531 S.W. 2d 953 (1976). That holding is sound, for we have pointed out that "processing" is such a flexible term that it might be applied to such simple matters as washing potatoes preliminary to placing them in sacks or removing stems from strawberries. *Scurlock* v. *Henderson*, 223 Ark. 727, 268 S.W. 2d 619 (1954).

Thus the question is not whether the appellee is engaged in "processing" but whether it is engaged in "manufacturing," which our statute declares is to be understood in its ordinary meaning. § 84-3106 (D) (2) (e), *supra.* Cases from other jurisdictions are of scant assistance, because their statutes differ from ours. Our own precedents, however, are controlling.

We are unable to distinguish the case at bar, in principle, from our decision in *Scurlock* v. *Henderson, supra.* There the question was whether cotton ginning machinery was exempt under the statute as it then read, which exempted "tangible personal property used by manufacturers or processors or distributors for further processing, compounding, or manufacturing . . . " Act 487 of 1949, § 6. The parallel between that case and the present one is very close. There we noted that a ginner removes trash from the cotton. Here the appellee removes dirt from its scrap iron. We noted that a ginner separates the cotton fiber from the cotton seed. Here the appellee separates the various metals from one another. We alluded to the fact that a ginner compresses the cotton into bales. Here the appellee compresses the scrap metal into cubes that are salable. We concluded that cotton ginning machinery was not exempt from the tax, because "ginning is not processing or manufacturing." The controlling principle, as we see it, is simply that the cotton ginner begins and ends with the same commodity, cotton, in an unmanufactured form, just as the appellee begins and ends with scrap metal that is yet to be made into something else.

The appellee relies upon our holding in *Ark. Ry. Equipment Co.* v. *Heath*, 257 Ark. 651, 519 S.W. 2d 45 (1975), where we held that a company which bought old railway tank cars and converted them into highway culverts was engaged in manufacturing. We stressed the complexity of the steps that were required to convert the tank cars into culverts and the fact that a different product was being created. We concluded that the taxpayer was in fact "a manufacturer of culverts." Here, by contrast, we cannot say that the appellee is a manufacturer of scrap metal, because that is what it begins with and what it ends with. It changes the form of scrap metal, but it does not make a new product.

It must be remembered that the appellee is seeking an exemption from the tax. We have consistently followed the rule that "an exemption from taxation must be strictly construed and to doubt is to deny the exemption." *Morley* v. *E. E. Barber Constr. Co.*, 220 Ark. 485, 248 S.W. 2d 689 (1952). The appellee has failed to meet its burden of showing clearly that it is engaged in manufacturing and is therefore exempt from the tax.

Although not argued in the briefs, the suggestion has been made in our discussion of the case that the scope of the exemption has been broadened by amendment since our decision in the cotton ginning machinery case. Actually, the exemption has been narrowed. As mentioned above, the original exemption was of "tangible personal property used by manufacturers or processors or distributors for further processing, compounding, or manufacturing." By Act 5 of the First Extraordinary Session of 1968, § 2, the exemption was rewritten to read essentially as it does today. What the amendment did was to limit the exemption to machinery and equipment used *directly* in the various stages of manufacturing "at manufacturing or processing plants or facilities in the State of Arkansas." We quote the pertinent part of the exemption as rewritten in 1968:

> (2) Machinery and equipment used directly in producing, manufacturing, fabricating, assembling, processing, finishing or packaging articles of commerce *at*[1] *manufacturing or processing plants or facilities in the State of Arkansas* [italics supplied], but only to the extent that such machinery and equipment is purchased and used for the purposes set forth in this subsection.

> \* \* \* \* \*

> (c) It is the intent of this subsection to exempt only such machinery and equipment as shall be utilized directly in the actual manufacturing or processing operation at any time from the initial stage where actual manufacturing or processing begins through the completion of the finished article of commerce and the packaging of the finished end product. The term "directly" as used in this Act is to limit the exemption to only the machinery and equipment used in actual production during processing, fabricating or assembling raw materials or semi-finished materials into the form in

---

[1] By a typographical error the word "at" was written as "and" when the subsection was re-enacted in Act 760 of 1975, § 2, which added an exemption of poultry processing equipment, but the fact that "and" was a typographical error is apparent not only from the context but also from the correct use of "at" in the corresponding sentence in § 1 of the same act, dealing with the sales tax instead of the use tax.

which such personal property is to be sold in the commercial market. Hand tools, buildings, transportation equipment, office machines and equipment, machinery and equipment used in adninistrative, accounting, sales and other such activities of the business involved and all other machinery and equipment not directly used in the manufacturing or processing operation are not included or classified as exempt.

The purpose of the 1968 amendment is perfectly clear. The original act, by exempting all tangible personal property used by manufacturers, could arguably have exempted office furniture, typewriters, automobiles, and various other personal property not used directly in the manufacturing process. The amendment limited the exemption to machinery and equipment used directly in manufacturing, but it still has to be used "at manufacturing or processing facilities." Thus the basic question is precisely the same as it was in the cotton ginning machinery case: Is this taxpayer engaged in manufacturing? Upon the authority of that decision the answer must be No.

Reversed.

CONLEY BYRD, Justice, dissenting. The majority's reliance upon the cotton gin case, *Scurlock* v. *Henderson*, 223 Ark. 727, 268 S.W. 2d 619 (1954), to overturn the trial court does not appear to be well founded. At the time the cotton gin case was before us, the Compensating Use Tax Act, Acts 1949, No. 487, § 6 provided:

"There are hereby specifically exempted from the taxes levied in this Act:

.   .   .

(d) Tangible personal property used by manufacturers or processors or distributors for further processing, compounding, or manufacturing; tangible personal property used for repair, replacement, or expansion of existing manufacturing or processing facilities or in creating new manufacturing or processing

facilities; and tangible personal property used in the repair, replacement, or expansion of existing, or in the creation of new, facilities used for public transmission, communication, or transportation purposes."

The General Assembly, following such cases as *Scurlock v. Henderson, supra,* amended the Compensating Use Tax Act so that the term manufacturers or processors or distributors would include cotton gins within its definition. Likewise, following the exemption of feedstuff in 1955, this Court took the illogical position in *Hervey Comm'r v. Tyson's Foods, Inc.,* 252 Ark. 703, 480 S.W. 2d 592 (1972), that items commonly added to chicken feed such as hormones and antibiotics did not constitute feedstuffs. The Court also there stated that "manufacturing and processing" were not two distinct operations — *i.e.* processing is carried out under the manufacturing process. Following the *Tyson* case, *supra,* the General Assembly passed with an emergency clause Acts 1973, No. 68 [Ark. Stat. Ann. §§ 84-1905.2 — 84-1905.5], specifically exempting medicinal preparations used in treating livestock and poultry. To avoid the construction that this Court has given to "manufacturing or processing" or "manufacturing and/or processing," the General Assembly in 1975 rewrote the language of the exemption set out in subsection 2 of subsection D of Section 6 of Act 487 of 1949 and added an emergency clause critical of the interpretations given to the terms "manufacturing" and/or "processing." See Acts 1975, No. 760, which became effective without the signature of the Governor and which, in so far as here pertinent, makes Ark. Stat. Ann. § 84-3106 (Supp. 1977) provide:

"There are hereby specifically exempted from the taxes levied in this Act:

. . .

(D) . . .

(2) Machinery and equipment used directly in producing, manufacturing, fabricating, assembling, processing, finishing, or packaging of articles of commerce and manufacturing or processing plants or

facilities in the State of Arkansas, including facilities and plants for manufacturing feed, processing of poultry and/or eggs and livestock and the hatching of poultry, but only to the extent that such machinery and equipment is purchased and used for the purposes set forth in this subsection.

. . .

The emergency clause added to Acts 1975, No. 760, provides:

"SECTION 5. EMERGENCY CLAUSE. It is hereby found and determined by the General Assembly that uncertainty exists as to the intended meanings of the terms 'manufacturing' and/or 'processing' as the same are used in Section 4 of the Arkansas Gross Receipts Act, as amended, and Section 6 of the Arkansas Compensating Tax Act, as amended, as a result of which the legislative intent is not being carried out and implemented; that the failure to carry out the legislative intent expressed in the sections amended herein is highly detrimental to the public interest of the State and that this inequitable situation should be corrected immediately. Therefore, an emergency is hereby declared to exist and this Act being necessary for the immediate preservation of the public peace, health and safety shall be in full force and effect from and after its passage and approval."

The majority's citation of *Heath* v. *Westark Poultry Processing Corp.*, 259 Ark. 141, 531 S.W. 2d 953 (1976); for the proposition that Hummelstein Iron & Metal Inc. does not qualify as a manufacturer under Acts 1975, No. 760 is likewise not well founded, for in that case we were construing the terms as they had been defined in Acts 1968, No. 5 (1st Ex. Sess.). It also involved a tax liability that had accrued in 1974 or prior years. The 1968 Act applied to machinery and equipment used directly in producing, manufacturing, fabricating, assembling, processing, finishing or packaging articles of commerce "at manufacutring or processing plants or facilities," whereas the 1975 Act, *supra*, exempts "machinery

and equipment used directly in producing, manufacturing, fabricating, assembling, processing, finishing or packaging of articles of commerce *and manufacutring or processing plants . . . ."* [Emphasis mine].

The majority suggests in a footnote that the word "and" in the 1975 Act is a typographical error. This is an asserted omnipotence and clairvoyance that I have not been privileged to observe among the ordinary mortals that have been elected to serve on the Supreme Court of Arkansas. Furthermore, it flies in the face of the finding of the General Assembly in Acts 1975, No. 760 § 5, *supra,* that the 1975 amendment was necessary because *"the intended meanings of the terms "manufacturing" and/or "processing" . . . is not being carried out and implemented."* [Emphasis mine].

Finally, the majority says that cases from other jurisdictions having to do with the exemption of commercial scrap dealers from the Compensating Use Tax are of scant assistance. With this statement I cannot agree because Acts 1975, No. 760 § 2 specifically provides:

> "(e) For the purpose of this subsection, the terms 'manufacturing' and/or 'processing' as used herein, refers to and include those operations commonly understood within their ordinary meaning, and shall include mining, quarrying, refining . . . ."

Since other jurisdictions recognize that commercial scrap operations are manufacturers within the meaning of their sales and use tax statutes — see *Butts* v. *Phelps,* 90 Mo. 670, 3 S.W. 218 (1887); *Middletown Iron & Steel* v. *Evatt,* 139 Ohio St. 113, 38 N.E. 2d 585 (1941); *Commonwealth* v. *Sitkin's Junk Co.,* 412 Pa. 132, 194 A. 2d 199 (1963); *Mayor and City Council of Baltimore* v. *State Tax Commissioner,* 161 Md. 234, 155 A. 739 (1931); and *H. Samuels Co.* v. *W. Department of Revenue,* 70 Wis. 2d 1076, 236 N.W. 2d 250 (1975) —, we likewise should give weight to such authorities on the issue of what is commonly understood to be "manufacturing" by those conversant with the commercial scrap metal trade. Otherwise, we will be in the position of the mother who pointed out that all of the marching soldiers, except her son Johnny, were out of step.

Last but not least, I wish to point out that the undisputed proof shows that the steel smelting mills cannot get scrap metal in the furnace doors until it has been baled. If the steel mills were baling the scrap in the same manner that Hummelstein is baling the scrap, I doubt that anyone would characterize the process as other than a part of the steel mill operation — *i.e.* manufacturing. Since Hummelstein performs the same process that the steel mill would have to perform to get the commercial scrap into the furnace doors why should Hummelstein's operation not be considered part of the operation necessary for the production of steel from recycled scrap — *i.e.* a part of the manufacturing process.

For the reasons herein stated, I respectfully dissent.

PURTLE, J., joins in this dissent.

DARRELL HICKMAN, Justice, dissenting. The majority has consistently voided exemptions to our use tax. In doing so, however, it has resorted to rewriting legislation. For example, we have held in effect that manufacturing or processing really means manufacturing and processing. *Heath* v. *Westark Poultry Processing Corp.*, 259 Ark. 141, 531 S.W. 2d 953 (1976).

Historically, after the majority has declared that a particular industry involved in manufacturing or processing does not qualify for an exemption, the General Assembly at its next session specifically names that industry.

I know that it must be difficult for attorneys and trial judges to find a thread of consistency in our opinions. I cannot logically or legally defend them. If there is a consistency, it is that the majority has made every effort to hold that a particular piece of property is not exempt from the tax.

Rather than rewrite legislation to suit ourselves we should meet the matter more head-on and either accept exemptions which are clearly warranted as a function of the General Assembly or declare the legislation unconstitutional as a violation of the equal protection clause of the constitution. I would prefer the latter because I feel that most, if not all exemptions, could not withstand the scrutiny of the equal

protection clause of the constitution. An industrial firm adds no more to the benefit of the State of Arkansas than a large merchandising firm and should not be granted any particular privilege. Moreover, the General Assembly is tempted at each session to exempt other industries or processing concerns. Invariably, it results in legislation which means that those individuals or concerns that do not seek special favors from the General Assembly have to bear an unfair share of the tax burden.

The chancellor in this case, in my judgment, was correct in finding that the appellee was exempt according to the legislation. It was the only logical decision. Since no constitutional issue was raised, I would affirm the decree of the chancellor.