SLIP OPINION

Cite as 2016 Ark. 209

# SUPREME COURT OF ARKANSAS

No. CV–15–799

| | |
|---|---|
| LARRY WALTHER, IN HIS OFFICIAL CAPACITY AS DIRECTOR, ARKANSAS DEPARTMENT OF FINANCE AND ADMINISTRATION<br><br>APPELLANT | **Opinion Delivered** May 19, 2016<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-10-6101] |
| V. | HONORABLE WENDELL GRIFFEN, JUDGE |
| CARROTHERS CONSTRUCTION COMPANY OF ARKANSAS, LLC<br><br>APPELLEE | <u>REVERSED AND REMANDED</u>. |

**HOWARD W. BRILL, Chief Justice**

The Illinois Bayou begins on the south slopes of the Ozarks in the Boston Mountains. Its four forks merge and provide Class II/III whitewater canoeing. On its downstream route through Pope County, it passes near the communities of Hector, Scottsville, and Dover before joining Lake Dardanelle in the Arkansas River. Although ideal for canoeing and bass fishing, the waters of the Illinois Bayou and the Huckleberry Creek Reservoir are not suitable for drinking by the residents of Russellville. The waters must first be cleaned. Thus begins this tax litigation.

## I. *Facts*

The City of Russellville created the City Corporation to operate, maintain, and improve the city's municipal waterworks system. The City Corporation manages a water-treatment plant that provides potable drinking water to the residents of Russellville. At the

water-treatment plant, a three-phase process includes the pretreatment, clarification, and final filtration of surface water that is transformed into potable drinking water.

In 1998, Carrothers Construction Company of Arkansas, LLC (Carrothers), a limited liability company headquartered in Kansas, constructed an expansion of the water-treatment plant. Carrothers purchased several items of machinery and equipment for the project. Carrothers installed this machinery and equipment for the extensive three-phase water-treatment process at the Russellville plant.

In July 2004, the auditor for the Arkansas Department of Finance and Administration (DFA) conducted an audit of Carrothers's records pertaining to its activities and purchases in 1999 and 2000 in performing its contractual obligations to expand the Russellville water-treatment plant. Carrothers claimed $1,266,463.35 as expenditures from state and local sales taxes and compensating-use taxes. The auditor determined that Carrothers purchased personal property from out-of-state vendors and that these purchases were subjected to Arkansas's state and local use taxes, plus interest. As a result of three separate audits, DFA proposed to assess $56,006.78 in state use taxes, $3674.57 in local use taxes, and $27,482.33 in interest against Carrothers. Carrothers objected to the assessments. After determining that some assessments were barred by the statute of limitations, on December 8, 2005, DFA issued a final assessment of $94,994.89 and a demand for payment. Carrothers paid a portion of these taxes in the amount of $5191.16 to DFA.

On October 25, 2010, Carrothers filed a complaint against Larry Walther in his official capacity as the director of DFA. Carrothers alleged that it was entitled to a refund of

SLIP OPINION

additional use taxes, to an order requiring the abatement of the unpaid portions of the final assessment, and to a court ruling "ordering the abatement of any portion of the disputed assessment by DFA attributable to items of tangible personal property not utilized in Arkansas or double included in the auditor's determinations."

On July 1, 2014, Carrothers filed a motion for summary judgment asserting that there were no genuine issues of material fact and that, as a matter of law, it qualified for a manufacturing exemption.[1] In its motion, Carrothers asserted that its purchases of tangible personal property, particularly the piping used to carry chemicals within the water-treatment plant and the concrete for the holding tanks, were exempt from taxation because those items were used in the plant's expansion. Attached to Carrothers's motion for summary judgment was an affidavit of Michael Morrand, owner and president of Carrothers, who described the extensive three-stage mechanical and chemical water-treatment process utilizing Carrothers's equipment.

The first phase of the water-treatment process begins with the raw surface water's pretreatment process known as "trash or debris removal." According to Morrand, the raw surface water is directed by gravity flow or pumped through intake structures where large items, such as logs, branches, leaves, and trash, are screened and removed. Morrand stated that a "number of chemicals are injected into the 'raw surface water' at this point for the

---

[1]A manufacturing exemption may be claimed for qualifying purchases of machinery and equipment for sales tax pursuant to Arkansas Code Annotated section 26–52–402 (Supp. 2015), and for compensating-use tax pursuant to Arkansas Code Annotated section 26–53–114 (Repl. 2004). For purposes of this opinion, we apply the terms, "manufacturing exemption" or "tax exemption," interchangeably to both sales and use tax.

purpose of removing contaminants that would affect the taste and odor of the final drinking water ('potable') product." Morrand explained that Carrothers constructed a chemical holding facility, with numerous tanks and piping, to facilitate this process.

During the second phase, known as the flocculation process, the water from the first phase is subjected to several additional chemical applications "designed to settle out microscopic particles and to clarify the partially treated 'raw surface water.'" Morrand stated that coagulant chemicals are injected at a "Rapid Mix Facility" and a second "SuperPulsator Clarifier," installed by Carrothers during the expansion, that removes "color, turbidity, and organic materials from the chemically treated 'raw surface water.'"

Lastly, Morrand stated that during the final water-treatment phase, the water is purified by exposing the water to chemicals, typically chlorine, lime, and fluoride, before it passes from a "Backwash Tank" into the "Final Filter Tanks." Morrand concluded that "many of [Carrothers's] purchases of items of tangible personal property (e.g., all of the piping used to carry the influent and the processing chemicals within this drinking water treatment plant, as well as the concrete for the holding tanks, etc.)" were exempt from Arkansas state and local sales-and-use taxes.

In response to Carrothers's motion for summary judgment, DFA contended that Russellville's water-treatment facility was not a manufacturer of water, but instead merely cleaned the water for human consumption.

On June 22, 2015, the circuit court granted Carrothers's motion for summary judgment and ruled that Carrothers was entitled to the manufacturing exemption set forth in

Arkansas Code Annotated section 26-52-402(a)(1)(A). As a basis for its ruling, the circuit court found that the "extensive mechanical and chemical treatment process turns a raw material into a finished product that is an article of commerce that is available for end users for drinking and other hygienic purposes." The circuit court ordered the abatement of the unpaid portions of sales and use taxes, penalties and interest assessed by DFA against Carrothers as set forth in the final assessment, and a refund of the portion of compensating-use taxes in the amount of $5191.16 that Carrothers paid to DFA because of the audit. DFA timely filed its notice of appeal. Pursuant to Arkansas Supreme Court Rule 1-2(b)(6) (2015), we have jurisdiction of this appeal because it involves a substantial question of law concerning the construction of a statute.

## II. *Analysis*

For its sole point on appeal, DFA argues that the circuit court erred in granting Carrothers's motion for summary judgment and in ruling that Carrothers was entitled to the manufacturing exemption. Specifically, DFA contends that because the water-treatment plant cleans water and does not manufacture it, Carrothers is not entitled to a manufacturer's tax exemption. Carrothers responds that the complex three-phase chemical and mechanical process of converting raw surface water into potable drinking water does constitute manufacturing under the statute.

This court reviews tax-exemption cases de novo on appeal. *Weiss v. Bryce Co., LLC*, 2009 Ark. 412, 330 S.W.3d 756. We have stated that the first rule in interpreting a statute is to construe it just as it reads by giving words their ordinary and usually accepted meaning.

*Aluminum Co. of Am. v. Weiss*, 329 Ark. 225, 946 S.W.2d 695 (1997). There is a strong presumption in favor of the taxing power of the state, and all tax-exemption provisions must be strictly construed against the exemption. *Weiss*, 2009 Ark. 412, 330 S.W.3d 756. The claimant has the burden of establishing the right to an exemption beyond a reasonable doubt, and to doubt is to deny the exemption. *Id*.

Under Arkansas's tax laws, a sales tax is levied on all sales to any person of tangible personal property. Ark. Code Ann. § 26-52-301 (Repl. 2014). Section 26-52-402(a)(1)(A) provides an exemption for equipment and machinery used directly in manufacturing:

> Gross receipts or gross proceeds derived from the sale of tangible personal property consisting of machinery and equipment used directly in producing, manufacturing, fabricating, assembling, processing, finishing, or packaging of articles of commerce at manufacturing or processing plants or facilities in the State of Arkansas.

The machinery and equipment will be exempt under subsection (a)(1)

> if it [sic] is purchased and used to create new manufacturing or processing plants or facilities within this state or to expand existing manufacturing or processing plants or facilities within this state.

Ark. Code Ann. § 26-52-402(a)(1)(B). Section 26-52-402(b) states that "[a]s used in this section, 'manufacturing' or 'processing' refers to and includes those operations commonly understood within their ordinary meaning."

Given these statutory provisions authorizing tax exemption, the issue then is whether the water-treatment plant engaged in manufacturing. This court has held that manufacturing and processing are not two distinct operations and that a taxpayer, in order to be entitled to the exemption, must first qualify as a manufacturer. *See Heath v. Westark Poultry Processing*

*Corp.*, 259 Ark. 141, 531 S.W.2d 953 (1976) (citing *Hervey v. Tyson's Foods, Inc.*, 252 Ark. 703, 480 S.W.2d 592 (1972)); *see also Scurlock v. Henderson*, 223 Ark. 727, 729, 268 S.W.2d 619, 620 (1954) (stating that processing "is a flexible term and might with strictness be applied to any alteration of raw material, such as cutting trees for conversion into lumber, washing potatoes . . . [and] removing stems from strawberries").

Further, this court has stated that merely putting raw material into a marketable form is not manufacturing. *Ragland v. Ark. Valley Coal Servs.*, 275 Ark. 108, 109, 627 S.W.2d 559, 560 (1982). Specifically, in *Ragland*, Arkansas Valley Coal Services bought coal from mining companies, crushed it, blended it, and sold it to steel mills for use as fuel. In determining whether the machinery qualified for an exemption, we emphasized that Arkansas Valley's process did not change the essential identity of the coal:

> Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, . . . There must be a transformation; a new and different article must emerge, having a distinctive name, character or use.

*Id.* at 109–10, 275 Ark. at 559 (quoting *E. Tex. Motor Freight Lines, Inc. v. Frozen Foods Express*, 351 U.S. 49, 53 (1955)). The Supreme Court's rationale provided a sound basis for our holding that Arkansas Valley had not clearly established its right to the tax exemption. *Ragland*, 275 Ark. at 110, 275 Ark. at 559.

Additionally, in *Pellerin Laundry Mach. Sales Co. v. Cheney*, 237 Ark. 59, 371 S.W.2d 524 (1963), Pellerin sought a manufacturing exemption for laundry and dry-cleaning machinery, arguing that because the soiled or dirty garments were given a new form, it was entitled to the tax exemption. This court found no merit in Pellerin's argument and affirmed

7

the chancellor's decision that the equipment was not exempt from taxation. *Id.* at 65, 371 S.W.2d at 528; *see also Gaddy v. Hummelstein Iron & Metal, Inc.*, 266 Ark. 1, 585 S.W.2d 1 (1979) (holding that a taxpayer who bought scrap metal from old cars and compressed it into cubes or bales did not qualify for the exemption because the taxpayer was not a manufacturer); *Scurlock*, 223 Ark. 727, 268 S.W.2d 619 (holding that the manufacturing exemption was not available to a company that purchased equipment to gin cotton because the equipment merely removed leaves, hulls, and seeds from the cotton).

Carrothers relies on cases such as *Arkansas Beverage Company v. Heath*, 257 Ark. 991, 521 S.W.2d 835 (1975), in which this court held that Arkansas Beverage Company, which bottled Pepsi Cola, was a manufacturer and was therefore entitled to a manufacturing exemption for cardboard cartons. This court held that Arkansas Beverage Company engaged in the manufacturing of a bottled carbonated beverage from numerous ingredients, such as chemically treated water, sugar, Pepsi Cola concentrate, vanilla, citric acid, and carbon dioxide, during the bottling operation. Unlike the present case, the manufacture of the Pepsi product in *Arkansas Beverage* implied a transformation of raw materials into a new product.

Here, Russellville's water-treatment plant did not manufacture or process a new product. Through an elaborate three-phase process, the water-treatment plant turned river water into drinking water. That water was taken from the Illinois Bayou, and that water was supplied to the residents of Russellville. It was water in the beginning, and it was water in the end. Carrothers acquired materials and constructed a facility to treat and clean the water, but it did not manufacture the water. Thus, Carrothers is not entitled to the manufacturing

exemption pursuant to section 26-52-402. We hold that Carrothers is not entitled to summary judgment as a matter of law. Accordingly, we reverse the decision of the circuit court and remand for a calculation of actual tax.

Reversed and remanded.

BAKER and GOODSON, JJ., dissent.

**KAREN R. BAKER, Justice, dissenting**. Because I would affirm the circuit court, I must dissent. The majority summarily reverses the circuit court with little analysis and ignores our precedent set in *Arkansas Beverage Company v. Heath*, 257 Ark. 991, 521 S.W.2d 835 (1975).

The question here is whether the treatment process of converting raw surface water into potable drinking water through the complex process used by Carrothers, including injecting chemicals into the water, constitutes manufacturing. The answer is yes.

In determining whether manufacturing has occurred, in *Ragland v. Arkansas Valley Coal Servs., Inc.*, 275 Ark. 108, 109–10, 627 S.W.2d 559, 560 (1982), which the majority relies on, we cited to the United States Supreme Court's holding:

> As the United States Supreme Court confirmed in *East Texas Motor Freight Lines, Inc. v. Frozen Foods Express*, 351 U.S. 49 (1955): Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, . . . There must be a transformation; a new and different article must emerge, having a distinctive name, character or use.

In *Arkansas Beverage Company* we addressed a situation analogous to the one in this case and held that Arkansas Beverage Company, which bottled Pepsi Cola, was a manufacturer and was therefore entitled to a manufacturing exemption for cardboard cartons. In holding that

9

the soft drinks produced were manufactured for purposes of the exemption statute, we

explained,

> In the preparation of the liquid beverage, water from the city supply is pumped into a reaction tank, where chlorine, lime and ferrous sulphate are added to reduce hardness and alkalinity, to oxidize such organic matter as bacteria and micro-organisms and to remove all insoluble material. The amounts of the chemicals vary from day to day after testing of the city water. The treated water is then passed through filters first of white, high silicate sand, then of carbon, and finally, of fine fiberglass. That water is added in proper proportions to granulated sugar in a stainless steel mixing tank to form a simple syrup to which is added, in precise order, a liquid concentrate purchased from the franchiser, vanilla, a citric acid solution, and, if necessary, a solution of benzoate of soda. The resulting mixture is "bottling syrup" if, after having been thoroughly stirred and left sitting for a certain period, and tested, it falls within accepted tolerances. Some syrups then require "aging" for a proper blending. After all tests are satisfactorily passed, the syrup passes into a tri-o-matic cooler where the syrup and water are mixed in exact proportions, cooled to 34 , and carbonated by being pumped through a spray head into a mist which is saturated with carbon dioxide gas. The finished beverage is then ready for the filling and crowning of bottles. This liquid goes into a uniblend filler, which by means of a counter-balance pressure system maintains a proper amount of the liquid in the filler tank where it, by a filling operation, is fed into the bottles, which have been through a cleaning and inspection process. Then the filled bottle is crowned and transferred to a belt for completion of the packaging and stacking process, after which it is moved to the stock warehouse or a delivery truck. The only item furnished by the Pepsi Cola Company is the concentrate.
>
> . . . .
>
> We find that appellant is engaged in manufacturing a bottled carbonated beverage from raw ingredients such as water, sugar, Pepsi Cola concentrate, vanilla, citric acid and carbon dioxide and that the plant wherein the process is carried on is a manufacturing plant.

257 Ark. at 1001–03, 521 S.W.2d at 841–42.

Here, like *Arkansas Beverage*, a complex process[2] also occurs. Further, a new and

---

[2]The majority has accurately described the complex process as follows:

> The first phase of the water-treatment process begins with the raw surface

different article has emerged, having a distinctive name, character or use: consumable drinking water. However, despite *Arkansas Beverage* being on point, the majority distinguishes our holding in that case in one sentence:

> Unlike the present case, the manufacture of the Pepsi product in Arkansas Beverage implied a transformation of raw materials into a new product.

This summary distinction is misplaced. Rather, like *Arkansas Beverage*, here, there is a transformation of non-consumable water into consumable water through a three-phase complex mechanical and chemical water-treatment process wherein fluoride and other

---

water's pretreatment process known as "trash or debris removal." According to Morrand, the raw surface water is directed by gravity flow or pumped through intake structures where large items, such as logs, branches, leaves, and trash, are screened and removed. Morrand stated that a "number of chemicals are injected into the 'raw surface water' at this point for the purpose of removing contaminants that would affect the taste and odor of the final drinking water ('potable') product." Morrand explained that Carrothers constructed a chemical holding facility, with numerous tanks and piping, to facilitate this process.

During the second phase, known as the flocculation process, the water from the first phase is subjected to several additional chemical applications "designed to settle out microscopic particles and to clarify the partially treated 'raw surface water.'" Morrand stated that coagulant chemicals are injected at a "Rapid Mix Facility" and a second "SuperPulsator Clarifier," installed by Carrothers during the expansion, that removes "color, turbidity, and organic materials from the chemically treated 'raw surface water.'"

Lastly, Morrand stated that during the final water-treatment phase, the water is purified by exposing the water to chemicals, typically chlorine, lime, and fluoride, before it passes from a "Backwash Tank" into the "Final Filter Tanks." Morrand concluded that "many of [Carrothers's] purchases of items of tangible personal property (e.g., all of the piping used to carry the influent and the processing chemicals within this drinking water treatment plant, as well as the concrete for the holding tanks, etc.)" were exempt from Arkansas state and local sales-and-use taxes.

chemicals are injected into the water. This process constitutes manufacturing, which exempts Carrothers from the sales-and-use tax.

Further, although not binding precedent, *Department of Revenue ex rel. Luckett v. Allied Drum Service, Inc.*, 561 S.W.2d 323 (Ky. 1978), supports my interpretation. In *Allied Drum*, the Kentucky Supreme Court considered whether machinery used to process metal drums was machinery used in manufacturing and therefore exempt from the sales-and-use tax. The Department of Revenue argued that the process did not constitute manufacturing because it did not produce a new article, but began with a used drum and ended with a used drum. *Id.* at 324. The Kentucky Supreme Court then examined previous decisions, including *Prestonsburg Water Company v. Prestonsburg Board of Supervisors*, 131 S.W.2d 451 (Ky. 1939). In *Prestonsburg*, the Kentucky court rejected the argument that a water filtration system was machinery used for manufacturing and thus held that it was not exempt from taxation. In so holding, the court explained that "[i]t creates no new product but is still water." The *Allied Drum* court overruled *Prestonsburg* and reasoned that the end product was something new, "water fit for use." 561 S.W.2d at 326.

Here, the extensive three-phase treatment process clearly constitutes manufacturing because it also involves the injection of numerous chemicals, including fluoride, at each of the three stages. Because the process is "manufacturing" as contemplated by the manufacturer's exemption, Carrothers should be exempt from the sales-and-use tax. The purpose of this exemption is to "encourage the location of new manufacturing plants in Arkansas, the expansion of existing manufacturing plants in Arkansas, and the modernization of existing

manufacturing plants in Arkansas through the replacement of old, inefficient, or technologically obsolete machinery and equipment." Ark. Code Ann. § 26-52-402(a)(2)(C). Carrothers's manufacturing of potable water has supported the statute's mission, yet the majority has ignored this.

Finally, although the majority holds that—"[i]t was water in the beginning, and it was water in the end. Carrothers acquired materials and constructed a facility to treat and clean the water, but it did not manufacture the water"—this holding ignores the details and complexity of the facts in this case.

Accordingly, based on my discussion above, I would affirm the circuit court.

GOODSON, J., joins.

*Jeffrey Weber*, Arkansas Dep't of Finance and Administration, for appellant.

*Sayre & Brockett*, by: *Christopher D. Brockett*; and *Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor* and *Tasha C. Taylor*, for appellee.